F. J. HARRISON & Co. v. BORING & KENNARD.

1. PURCHASER—QUIT-CLAIM DEED.—A purchaser who has taken a quit-claim deed is not entitled to protection in a court of equity as a purchaser for a valuable consideration without notice; he takes under such a deed only such interest as his vendor could lawfully convey.

2. DEED, WARRANTY.—Where a deed assumes to convey the land and not merely the title (such as it is) that the vendor has in it, and there is a general warranty, the deed not only imports a *bona fide* conveyance in reference to the subject of the sale and purchase designed thereby to be vested in the purchaser, but it will carry any after-purchased right or title that may be acquired by the vendor.

3. QUIT-CLAIM DEED.—A deed to land which binds the vendor to warrant "the title hereby conveyed against the lawful claim of all persons claiming the same or any part thereof from, by, through, or under him," is but a quit-claim deed, notwithstanding the special warranty, for that refers to the estate or title sold and not to the land.

4. BONA FIDE PURCHASER.—But if the deed on its face contains evidence that the absolute right to the land, and not the title or chance of title, is sought to be sold, or if this fact appear from the adequacy of the price given, or other circumstances attending the purchase, then the purchaser may be a *bona fide* purchaser, notwithstanding the deed may have, in some other respects, the qualities of a quit-claim deed.

5. CONSTRUCTIVE NOTICE.—An example of what would amount to, given.

6. The owner of land may create an easement by parol agreement or representation which has been so acted on by others as to create an estoppel *in pais*, as when one, trusting the agreement or representation, has, on the faith thereof, expended moneys which would be lost if the right to enjoy the easement could be revoked.

7. If one so expresses himself to another that the one addressed may reasonably infer the existence of an agreement or license, whether the party intends that he should do so or not, it has the effect that the party using the language cannot afterwards gainsay the reasonable inference to be drawn from his words.

APPEAL from Gregg. Tried below before the Hon. Z. Norton.

Suit by F. J. Harrison & Co. against Boring & Kennard to enjoin them from appropriating to their private use a portion of a lot in the town of Longview, alleged to have been sold under such circumstances, by the Southern Pacific Railroad Company, at the original sale of lots, as to create an easement thereon in favor of plaintiffs. The pleading and evidence referred to in the opinion are sufficiently stated for a proper understanding of the case.

*McKay & Mabry*, for appellants, cited Hermon on Estoppel, p. 494, secs. 517, 518; Wash. on Easements, p. 97; 1 Boy, 239; Powell *v.* Thomas, 6 How., 300; Campbell *v.* McCoy, 31 Penn., 263; 3 Paige, 254; Oswald *v.* Grenet, 22 Tex., 100; 3 Vt., 530; 13 Minn., 13; 3 Barb., 254; 6 Pet., 431; 15 Mo., 634; 3 B. Monr., 27; 2 Mart., 223; 6 Whart., 193; Serg. & R., 227; 5 Denio, 213; 19 Ib., 558; Hill *v.* Miller, 3 Paige, ch. 254; 8 Paige, 351; 38 Barb., 513; 14 Ohio, 54; Leonard *v.* Leonard, 7 Allen, 277; 1 Comst., 242; 9 Cow., 13; 9 Wheat., 432; 1 Paige, 473; 25 Call., 154; 33 Ib., 288; 24 Id., 114; 11 How., 322; 34 Tex., 453; 12 Pick., 48; 3 Story C. C., 365.

*A. T. Burke*, for appellees, cited Oswald *v.* Grenet, 15 Tex., 118; 22 Tex., 99; 3 Kent, 517, 518, 524, and note 576; 8 Tex., 462; 19 Tex., 64; 1 Tex., 34; 2 Tex., 49; 19 Tex., 226; 15 Tex., 410; 7 Tex., 226; Ib., 587; 8 Tex., 336; 4 Tex., 93.

*Drury Field*, also for appellees.

ROBERTS, CHIEF JUSTICE.—The grounds of action set up by the plaintiffs are that the lot No. 7, upon which they erected their banking-house, was adjoining to an open space represented in the plat of the town of Longview by lots Nos. 6 and 5, in block 21, upon which the defendants had no right to build a house or otherwise use for private purposes as their own property, because, first, said lots Nos. 6 and 5 had been dedicated to the public use as an open space in connection with the railroad depot at the time the lots of said town were sold by a public announcement made by the authorized agent of the railroad company who laid off the town and sold the lots on land belonging to the company; and, secondly, that said lots Nos. 6 and 5 were part of an open space upon which he had a right of servitude by reason of a right of easement pertaining to lot No. 7, conferred at the time of its sale by an announcement made by the said au-

thorized agent of said company that the space occupied by lots No. 6 and 5 would not be sold, but would be kept open for depot purposes, upon the faith of which public announcement Holt & Gilchrist purchased said lot No. 7 at a high price, and upon faith of which the plaintiffs afterwards bought part of lot No. 7, and erected their banking-house, with one side fronting upon and in reference to said open space, and had placed a permanent pavement thereon as a walk to one of the entrances to their said house from the said open space. Plaintiffs averred that said space had been kept open and used as such by those who had owned lot No. 7 and all others whose business in connection with the depot required it, from the time of the sale of the lots in 1870 until 1874, when defendants commenced the erection of their house immediately in front of and adjoining to that of the plaintiffs.

Plaintiffs further allege that Holt & Gilchrist having bought lots Nos. 7 and 8 with reference to lots Nos. 6 and 5 being kept open as a convenience and advantage to their business house, demanded that it should be declared in their deed ; and to secure them in that respect, and for that purpose alone, the president of said company, before delivering the deed and receiving the purchase-money, wrote under the same the following statement, viz : " It is hereby agreed and understood that said company will not sell lots Nos. 5 and 6 on block 21 to any person or persons other than said Holt & Gilchrist.

W. A. HAUSER, *Prest.*"

The defendants deny that lot No. 6 was dedicated to public use, or that any easement in reference thereto pertained to lot No. 7, and alleged that they were *bona fide* purchasers of the north half of lot No. 6, for a valuable consideration, without notice of any such dedication or easement, and make an exhibit of their deed executed to them by the Texas Pacific Railroad Company, successor to the Southern Pacific Railroad Company, in which said company, for the sum of three

hundred and fifty dollars, (one hundred and seventy-five paid down and the balance secured by two negotiable notes, the last of which is due on the 19th of May, 1876,) grants, bargains, sells, and conveys to Boring & Kennard, "all of its right and title in and to" the north half of lot No. 6, and (after expressly retaining a vendor's lien) "binds itself to warrant and forever defend the title hereby conveyed against the lawful claim of all persons claiming the same or any part thereof, of, from, by, or through said company." This deed bears date the 19th day of May, 1874.

The defendants, in their answer, make exhibits of the deeds of the several persons through whose hands lots Nos. 7 and 8 have passed. All of them except that from Pegues & Co. to the plaintiffs, dated 16th of August, 1873, make some reference to the privilege, as it is termed, acquired by Holt & Gilchrist on lots 6 and 5, in the purchase of lots 7 and 8, at the sale of the lots, the vendors binding themselves not to buy lots Nos. 6 and 5, and conveying their privilege or rights thereon. The last vendees of these lots Nos. 7 and 8 (except as to that part of lot 7 that was owned by plaintiffs) Womack, Luckett & Womack, for the consideration of ten dollars, executed a deed releasing to the company this privilege or right on the north half of lot 6, dated the 25th day of June, 1874, over a month after the date of the company's deed of the north half of lot 6 to the defendants, Boring & Kennard.

Under the evidence adduced on the trial and the charge of the court the jury found a verdict for the defendants, and assessed their damages, for the wrongful suing out the injunction, at one hundred dollars. The judgment of the court was rendered according to the verdict.

The grounds in the motion for a new trial and the errors assigned are, that the court erred in the charge to the jury and in refusing to give the charges asked by the plaintiffs, and that the verdict of the jury was contrary to the law and the evidence.

The charge of the court defined with reasonable clearness what constituted a dedication to public use as a public common, but very indefinitely what constituted an easement, which would give the purchaser of a lot a right to have an adjoining space kept open, which, under the evidence, was certainly the most important issue in relation to that branch of the case. The charge asked by the plaintiffs, which is marked "refused, believing the same as given as far as proper," related to what facts would put the defendants upon notice of the dedication or easement. Following this is a charge asked by the plaintiffs, which is not signed by the judge as either given or refused, which sought to have the jury instructed that Boring & Kennard, under their deed, had acquired only such right to the north half of lot 6 as the company had at the time of the execution of the deed to them.

If this charge was given to the jury, as might be supposed from its being filed in the cause, it was contrary to the charge of the court which had been given previously, to the effect that if plaintiffs had acquired rights upon lot 6 by an easement or dedication and the defendants had no notice of it, and there were no facts known to them which would have reasonably put them upon inquiry, so as to have led them to a knowledge of such right, the defendants were entitled to a verdict in their favor as *bona fide* purchasers. This charge was erroneous, if their deed was only a quit-claim deed, under the decision of this court and of that of the Supreme Court of the United States, as well as that of other States. (Rodgers v. Burchard, 34 Tex., 453; Oliver *et al.* v. Piat, 3 How., 410; Van Rensselaer v. Kearney *et al.*, 11 How., 322.)

If it can be construed that the statement of Hauser, the president of the company, written under the deed to Holt & Gilchrist, conveyed an easement, and that it was finally conveyed back to the company after the defendants' purchase by the deed from Womack, Luckett & Womack, that would

not vest any right in defendants through a quit-claim deed further than that possessed by the company when it conveyed to them. (Dikes v. Miller, 24 Tex., 425; Same v. Same, 25 Tex. Supp., 290; Boge v. Shoab, 13 Mo., 380; Cadiz v. Majors et al., 33 Cal., 288; McCrackin v. Wright, 14 Johns., 194; Jackson v. Winslow, 9 Cow., 18.)

If, however, a right of easement attached to lot No. 7 in the original sale of it, it applied to all parts of it adjoining lot No. 6, and would pass to a part of it, under a deed in ordinary form, as that made by Pegues & Co. to the plaintiffs for a part of lot 7, which did for sixty feet adjoin lot No. 6. (Wash. on Easements, p. 36, sec. 15.)

The deed of the Texas Pacific Railroad Company to the defendants being in the terms above recited, is in form a quit-claim deed, notwithstanding there is in it a special warranty of the title against the claim of all persons claiming by, through, or under it. Where the deed assumes to convey the land and not merely the title, such as it is that the vendor has in it, and there is a general warranty, the deed not only imports a *bona fide* conveyance in reference to the subject of the sale and purchase designed thereby to be vested in the purchaser, but it will carry any after-purchased rights or title that may be acquired by the vendor, thereby avoiding a circuity of action on the general warranty. (2 Hilliard on Real Prop., 423, sec. 102; Jackson v. Winslow, 9 Cow., 18.)

It is stated in Bouvier's Institutes that a quit-claim deed has with us nearly the same effect as a release at common law; the words which are effective in it are the same as in a release, to wit, "release, remise, and quit claim." In these the grantor does not warrant against a paramount or adverse title, but only against himself and those who claim under him. (2 Bouv. Ju., art. 2070, p. 416; Comstock v. Smith, 13 Pick., 116; Bigelow on Estoppel, 336, 337, 338.)

"A quit claim or deed of release of all one's right, title, and interest purports to convey and does convey no more

than the present interest of the grantor, and does not operate to pass an interest such as may afterwards vest." (Rodgers *v.* Burchard, 34 Tex., 452; 2 Hilliard on Real Prop., 318, 423; Boge *v.* Shoab, 13 Mo., 380; Oliver *v.* Piat, 3 How., 410.)

The principle upon which such a special warranty in connection with such terms of conveyance does not prevent the deed from being a mere quit claim, is said to be that it refers to the estate or title sold and not to the land. (Comstock *v.* Smith, 13 Pick., 116; 2 Hilliard on Real Prop., 423.)

The Supreme Court of the United States, while admitting the general principle as above stated, held that it was applicable to a quit claim in the strict sense of that species of conveyance, and that it would be different where the deed bears on its face evidence that the grantors intended to convey and the grantee expected to become invested with an estate of a particular description or quality.

Van Rensselaer *v.* Kearney *et al.*, 11 How., 322, from which it may be fairly deduced that where the deed contains evidence that the absolute right to the land and not the title or the chance of the title is sought to be sold and bought, the purchaser may be a *bona fide* purchaser, notwithstanding the deed may have in some other respects the qualities of a quit-claim deed in form.

Not only the terms of the deed but the adequacy of the price given, and other circumstances attending the transaction, may serve to show, when brought in evidence, whether the purchaser bought the land or bought merely the title.

In this case, then, it is concluded that the court was not authorized to assume that the deed referred to was, from its terms, more than a quit-claim deed, and imported on its face such a conveyance of the land as would make the purchaser a *bona fide* purchaser.

The fact appearing in the deed that the company expressly retained a vendor's lien might be construed as tending to

show that it was intended to sell the land with the absolute right of the fee, and not merely the title or chance of the title, and if that fact had been aided by proof of payment of full value of the lot, as though no adverse interest was claimed on it, or other like circumstances, it might have been left to the jury to determine in connection with the deed whether or not the parties intended to convey such absolute right to the land as that it was not regarded and intended by them to be a mere quit-claim deed to the land, notwithstanding it purported to convey only the company's right and title, and contained only a special warranty. A deed, as other instruments, may be read and construed under the light of the surrounding circumstances under which it was executed.

While a deed may be so plain in its terms as to require the court to construe it to be a quit-claim in one case or an absolute conveyance of the land in another case, still its wording may be such as to raise a question whether it is the one or the other, and in that event the circumstances under which it is made and purposes for which it is made may be considered to fix its true character as being the one or the other. (11 How., 322; Sweet *v.* Green, 1 Paige, Ch., 473.)

To defend as a *bona fide* purchaser in addition to a *bona fide* purchase of the absolute right to the land, in contradistinction to that of the title or claim of title, it must also appear that the purchase was made for a valuable consideration by proof outside and independently of the recital in the deed and without notice of the adverse claim, either actual or constructive. (Watkins *v.* Edwards, 23 Tex., 447; 2 Hilliard on Vendors, 202; 2 Story's Eq., sec. 1502, p. 868.)

In the case of Wethered *v.* Boon it is said, quoting 4 Kent, 179, that "the general doctrine is that whatever puts a party upon an inquiry amounts in judgment of law to notice, provided the inquiry becomes a duty, as in case

of purchasers and creditors, and would lead to the knowledge of the requisite fact by the exercise of ordinary diligence and understanding." (17 Tex., 150.)

It is said in another case that " the notice is sufficient if it be such as men usually act upon in the ordinary affairs of life." (Curtis *v.* Mundy, 3 Met., 405.)

It was proved in this case that one of the defendants had been mayor of the town. But suppose that they had both been strangers, just arrived at the town of Longview, desiring to buy a business lot, and had seen an open space between the depot house and lot 7, used for weighing cotton and other purposes by those having business at the depot and surrounding business houses, and had seen plaintiff's banking house, situated on lot No. 7, fronting on the open space, with a door entering thereon and windows looking out thereon, and other ornamental and substantial work as a finish for said front worth one thousand dollars more than a plain wall, with a permanent stone pavement adjoining thereto situated on part of the open space, such facts alone, it is believed, would have put ordinarily prudent men upon inquiry to ascertain what rights plaintiffs and others had upon the intervening open space between lot No. 7 and the depot house. And if they had been induced thereby to search the records the statement under the deed to Holt & Gilchrist would have sent them to the owners of lots Nos. 7 and 8, who could have informed them that there was a right claimed of some sort that had been transferred by deed in the transfer of said lots, and upon further inquiry could have learned from the citizens of the announcement made in relation thereto at the sale of said lots less than four years previously.

A. Duke, one of plaintiff's witnesses, stated that before defendants Boring & Kennard bought the lot he told Boring that he thought it could not be sold, and told him what took place at the sale of the lots. Boring says that Duke told him about this after they had bought, but he

shows by his testimony that he regarded that they had bought when they had made a contract for the purchase, and that ten or twelve days after that contract was made the company offered to return to them the money ($175) which they had advanced and for which they had its receipt, and annul the trade, which they refused to do, and demanded a fulfillment of the contract, after which the deed was delivered to them by the company.

The inquiry naturally suggests itself, Why did the company offer then, before the lot was conveyed, to annul the trade, and what reason was then given for it? Under the light of all the circumstances in proof, the answer is easily understood without its being told in the record, and from all which it is obvious, as the facts are here presented, that the defendants, before the trade was closed by deed, were put upon inquiry amounting to notice, and that, with the opportunity offered them of receding without damage, they voluntarily demanded and received of the company a conveyance of the lot, which defeats their plea of *bona fide* purchasers for a valuable consideration without notice. A different case might be made on this subject on another trial, but so it appears on the evidence as here now presented in the record.

Whatever error may have been committed in the charge of the court and in the finding of the jury on the subject that has been considered, it is wholly immaterial, if there was no evidence upon which the jury could have found that lots Nos. 6 and 5 were either dedicated to public use or subject to an easement purtenant to lot No. 7.

The charge of the court in reference to the dedication to public use as a common was unobjectionable, and the evidence relating to that subject was not of a character to require any discussion of it, as it can hardly be supposed, from anything that appears in this case, that the railroad company would dedicate the grounds around and contiguous to its depot as a public common, to be taken charge of

and controlled by the corporate authorities of the town as a public square or a public street.

The important question is, Was the space occupied on the plat of said town by lot 6 reserved from sale and permanently set apart as a space to be kept for depot purposes, upon the faith of which lots adjoining thereto (one of which was No. 7) were purchased and built upon, by which an easement was attached to said lot No. 7, entitling its owner or owners to a servitude on lot 6 as an open space, or to be afterwards appropriated alone to depot purposes, and not to private use, as attempted by the defendants, Boring & Kenard, in building a business house upon it adjoining that part of lot No. 7 owned by plaintiffs?

This ground of action is distinctly and plainly set out in the supplemental petition. The charge of the court fails entirely to convey to the jury any distinct idea of it, but continually, in any reference made to it, blends with it a dedication to the public, leaving the jury to understand that lot 6 must have been dedicated to the public use, in contradistinction to a reservation from sale for depot purposes, to have invested the purchasers of lot 7 with any rights upon it. It would have amounted to the same thing, substantially, if the court had charged the jury that the plaintiffs could claim no right on lot No. 6 by reason of being the owners of part of lot No. 7, unless lot No. 6 had been dedicated to the public when the lots were sold. The charge went further than merely producing confusion in this regard by adding, as follows, to wit: "But if the reservation or dedication was for the railroad company, or for the benefit of the railroad company, it was no dedication to the public, nor was it for the benefit of the public, for in that event it would be the railroad company interested in such dedication, and not the public."

There was no inconsistency in the right of easement of plaintiffs and the appropriation of lot 6 by the company for depot purposes. Both might exist, and the company have

the fee of the land and the control of the space left for depot purposes, and still plaintiffs might have a right of servitude upon lot 6, so far as it was consistent with its use for depot purposes, by virtue of his right of easement attaching and pertaining to lot 7, by the terms of its sale originally, upon the faith of which the purchasers and those holding under them had invested their means in the purchase and in erecting valuable improvements in reference thereto.

"An easement is a liberty, privilege, or advantage in land without profit, existing distinct from the ownership of the soil." (Herman on Estoppels, sec. 517; 3 Kent's Comm., 565.)

"Rights of accommodation in another's land, as distinguished from those that are profitable, are properly called easements." (Wash. on Eas. and Serv., 3.)

"The essential qualities of easements are these: 1st, they are incorporeal; 2d, they are imposed on corporeal property and not upon the owner thereof; 3d, they confer no right to a participation in the profits arising from such property; 4th, they are imposed for the benefit of corporeal property; and 5th, there must be two distinct tenements, the dominant, to which the right belongs, and the servient, upon which the obligation rests." (Wash. on Eas. and Serv., 3.) Servitude is the burden imposed on one tract of land for the benefit of another tract, to be enjoyed thereon as an advantage, liberty, or privilege to the owner of the latter tract. (Wash. on Eas. and Serv., 5, 276.)

By virtue of such a right the proprietor of the estate charged is bound to permit or not to do certain acts in relation to his estate for the utility or accommodation of a third person, or of the possessor of an adjoining estate. (3 Kent's Comm., 535, 536.)

Servitudes or easements must be created by the owner. (3 Kent's Comm., 537.)

The owner of land may create an easement by a parol agreement or representation which has been so acted on by

others as to create an estoppel *en pais.* As "where he has by parol agreement granted a right to such easement in his land, upon the faith of which the other party has expended moneys which will be lost and valueless if the right to enjoy such easement is revoked, equity has enjoined the owner of the first estate from preventing the use of it." (Wash. on Eas. and Serv., 97, and numerous cases cited.)

" While the uses and purposes for which a proper dedication may be made are public in their nature, such as ways, landing places, public parks, commons, pleasure grounds, cemeteries, churches, court-houses, and the like, and to constitute a technical dedication it must be to the public for a public use. There is a somewhat numerous class of cases where the subject-matter is a way or an open area, like a public square, and an act has been done by the owner which creates for individuals rights therein in most or all respects like those which they would have by a proper technical dedication, while the easement is a private and not a public one." (Wash. on Eas. and Serv., 220.)

As where lots are sold on a street as represented by a map, private easement on the strip of land may be acquired by the purchasers of the lots, though it never becomes a public street. (Bissell *v.* N. Y. Cent. R. R. Co., 23 N. Y., 61 ; Same *v.* Same, 26 Barb., N. Y., 63.) The map operated in such case as a representation which was acted on.

Where, also, the owner of a block of land sold off lots to divers persons, representing to each one separately in selling that a strip of eight feet front on the lots was to be left open, though no such reservation was made in the several deeds, and houses were built back of and leaving open said strip in front in pursuance of said representation, equity, at the instance of those who had so built, enjoined and restrained a purchaser of one of the lots who had commenced to build on the reserved strip. Although there was no agreement that constituted a legal obligation, the representation that such was to be the plan of building on said

block, made to each one in the sale of the lots, and acted on by some of them who had built in accordance with it, and upon the faith of its observance by the rest, conferred upon those who had thus built an easement upon each of their lots in reference to the said strip fronting on all of the said lots that a court of equity would recognize and enforce as a substantial right. (Tallmadge *v.* East River Bank, 26 N. Y. Rep., 105 ; see other cases of same class in Wash. on Eas. and Serv., 97 to 106.)

The equitable doctrine of estoppel, founded on representations and conduct acted on by others, is quoted from an English authority by Bigelow, as follows, to wit: "If any person, by a course of conduct, or by actual expressions, so conducts himself that another may reasonably infer the existence of an agreement or license, whether the party intends that he should do so or not, it has the effect that the party using that language or who has so conducted himself cannot afterwards gainsay the reasonable inference to be drawn from his words or conduct." (Bigelow on Estop., 556.)

Now to apply these principles of law to the case before us. It is stated by all of the witnesses that were present that Hall, who was the authorized agent of the company, in laying off and selling the lots of the town of Longview, publicly announced at the sale that lots 6 and 5 in block 21 would not be sold, and that lots 8 and 7 were the first lots sold, and brought the highest price of any lots that were then sold. The important question is, were his conduct and expressions then such as to reasonably produce the inference on the part of Holt & Gilchrist, the purchasers of lots 8 and 7, and others then present, that lots 6 and 5 were to be reserved permanently from sale and to be appropriated to depot purposes alone, and not afterwards to be sold to other persons and used as private property, so as to prevent lot 7 from being contiguous and next adjoining to the grounds so reserved for depot purposes alone, and did Holt & Gilchrist first, and plaintiffs afterwards, act upon and invest

their means in purchasing and in making valuable improvements by reason of and in reliance upon such reasonable inference? If so, the company was estopped from afterwards selling part of lot 6 to the defendants, to be devoted to their own private use, and the injunction against them should have been sustained.

On the 28th day of September, 1870, a number of persons were assembled on the line of the railroad of the Texas Pacific, to attend the sale of the lots in founding a town around and in connection with a depot on said railroad to be thereafter established. The plat of said town laid off lots, blocks, streets, and avenues, without leaving any open space for the depot grounds around the depot building that was to be erected, but it was indicated thereon that said building would occupy the south half of lots 1, 2, 3, and 4 of block 21, contiguous to the railroad track, and its position on the plat was marked.

Hall, the authorized agent of the railroad company, that owned the land, as it may well be presumed from the evidence, desired to reserve from the sale a sufficient space for depot purposes, and to render the depot building secure from fire communicated from surrounding buildings of others. As the town was to be built solely with reference to the depot, those desiring to purchase lots on which to establish business houses would reasonably seek to purchase lots as near as possible to the depot, so as to have an open space only appropriated by the company to depot purposes between their lots and the depot building. The most valuable lots, as indicated by the prices for which they were sold, Nos. 8 and 7, in block 21, were first put up for sale, and were both bought by Holt & Gilchrist, who soon ofterwards established an extensive business house on lot 8, and used lot 7 in connection with the space occupied by lot 6, as shown on the plat, in receiving and weighing and otherwise handling cotton in their business. Though it was stated otherwise by one witness, A. Duke, the clerk of Holt & Gil-

christ, testified that lot 7 sold for more than lot 8, giving the exact figures. Why did lot 7 sell for as much as lot 8, and both for more than any other two lots at said sale? Because lot 8 was bounded by three streets, and lot 7 was contiguous to the space to be occupied for depot purposes alone, would reasonably account for it. A business establishment on those lots would be more secure from fire than other lots, which is known to be an important consideration in relation to localities in newly-erected depot towns. It would also have more advantages in the way of convenience and accessibility in its business with the depot than any other. All this however is upon the supposition that lots 6 and 5 were to remain permanently reserved for depot purposes. For if it had been understood that lot 6 would be sold so as to make lot 7 an inside lot, and shut it out from the depot, it is difficult to see why lot 7 should have brought such a price as it did, higher than any other lot, as sworn to by Duke, or why lots 7 and 8, thus shut out by intervening business houses, should be more valuable than other lots then sold, that would, in that event, have been nearer and more accessible to the depot for business purposes, and no more subject to fire. Did Hall do or say anything in reference to this sale that was calculated to produce and did produce the understanding on the part of the bidders that lots 7 and 8 were the most valuable, and thereby induce the highest prices to be given for them, on account of the advantages of their locality in reference to the depot? Gilchrist testified that before lot 7 was sold at public outcry, Hall publicly announced that no other lots in block 21 would be sold, but that they would be left open for the public and for depot purposes. He explained that the statement written under the deed to Holt & Gilchrist was placed there as a security that lot 6 should not be sold at all, and not to enable Holt & Gilchrist to purchase the same.

Taylor, a witness for plaintiffs, testified that before the sale

of the lot 7 Hall publicly announced that no other lots but lot 7 in block 21 would be sold, but would be left open for depot and depot purposes.

Duke and Clark testified that it was announced before the sale of lot 7 that lots 5 and 6 would never be sold.

Green testified that before the sale commenced public announcement was made that no other lots but 7 and 8 in block 21 would be sold, but the balance would be left open lots.

McKellar testified that before the sale commenced a public announcement was made that all of the lots east of lots 7 and 8 in block 21 would be reserved for depot and depot purposes. His understanding was that they were to remain unsold for depot purposes and as a public plaza.

Cundiff did not hear the announcement, but from information derived from others, understood while lot 7 was being sold that lots 5 and 6 were to be left open, and therefore he bid for lot 7 the sum of $915.

On the other hand, Durham, witness for defendants and partner of Cundiff, stated that the announcement was made after the sale of lots 7 and 8 that no more lots in block 21 would be sold, but that they would be reserved for depot purposes, and that if he had known that fact while lot 7 was being sold that he and his partner, Cundiff, would have given more for that lot.

Pegues, witness for the defendants, agrees with Durham as to the time of the announcement.

None of the other witnesses, to wit: Methvin and Buttrell, for plaintiffs, and Park, Carroll, and Walker, for the defendants, who were present at the sale, state as to the time of the announcement; but they do state substantially that a public announcement was made at the sale that lots 5 and 6 would be reserved from sale for depot purposes, except Methvin, who said he was told the same that day by Hall while they were standing together on lot 6. He was the donor of the land for the town site.

Hall, witness for the defendants, stated that lots Nos. 1, 2, 3, 4, 5, and 6 in block 21 were not sold by him at said sale, but "were reserved for depot purposes for the benefit of the railroad company and to protect the depot against fire." And he further stated that "at said sale he did not make, or authorize to be made, publication that lots Nos. 5 and 6 in block 21 should perpetually remain as free lots and a public common in said town."

It is to be here noticed that Hall does not state what proclamation he did make·in reference to lots 5 and 6, or whether or not he made any whatever relating thereto.

It appears in evidence that plaintiffs, in 1874, desiring to build their banking house upon a corner lot, made inquiry of Pegues & Co., from whom they purchased, and from an officer of the Company, Dixon, the superintendent, and not the land agent, in reference to lots 6 and 5, and upon the information which they obtained, that the said lots could not be devoted to a private use, they made their purchase of part of lot 7, and erected valuable improvements thereon, in reference to said lot 6 being used alone for depot purposes.

It is certain that if the defendants should proceed in the erection of their building on lot 6, they, the plaintiffs, would be materially damaged.

The evidence, as to the purpose for which the lots 6 and 5 were reserved, scarcely requires any comment, in view of the principles of law that have been announced in reference to the right of easement and ·the mode of acquiring it in land. The great body of the evidence is on one side of the issue, and that is against the verdict of the jury.

We are of opinion therefore that the court erred in not granting the plaintiffs a new trial upon the grounds set forth in the motion made for it.

Judgment reversed and cause remanded.

REVERSED AND REMANDED.