# Supreme Court of Texas

No. 24-0213

John P. Boerschig,

*Petitioner,*

v.

Rio Grande Electric Cooperative, Inc.,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

JUSTICE BLAND, joined by Chief Justice Blacklock, Justice Lehrmann, and Justice Huddle, dissenting.

In the face of conflicting evidence, a trial court asked a jury to resolve whether an easement holder had exceeded the scope of its easement. The jury concluded the easement holder did not. Reviewing the same evidence, the Court in error (1) concludes the upgrade departs from the route's historic use and thus is a trespass as a matter of law, countermanding the jury's verdict; and (2) shifts the burden of proof from the landowner urging a trespass claim to the easement holder defending against that claim. The Court remands the trespass claim the jury rejected.

The jury properly concluded, however, that the easement holder did not exceed the scope of its easement, thus denying an essential element of the landowner's trespass claim. The landowner bears the burden to prove that the easement holder trespassed on his estate. The landowner rightly accepted this burden, raising no objection to it in the trial court. Legally sufficient evidence supports the jury's conclusion. We should affirm. Because the Court does not, I respectfully dissent.

## I

From 1931 to 1963, the number of American farms with electric service jumped from about ten percent to over ninety-seven percent.[1] Private electric companies perceived no profit in bringing electricity to rural America. To address this gap, associations of farmers and small businesses—with little or no experience operating electric systems— formed nonprofit cooperatives to take advantage of federal loan programs.[2] The nonprofits relied on members' voluntary contributions, including land donated by farmers and ranchers for electrical

---

[1] *See* Gabriel Pacyniak, *Greening the Old New Deal: Strengthening Rural Electric Cooperative Supports and Oversight to Combat Climate Change*, 85 Mo. L. Rev. 409, 420, 428 (2020) ("By 1963, over 97% of farms in the United States had electricity service, with approximately half being served by cooperatives and other [federal] borrowers."); Herman H. Trachsel, Public Utility Regulation 415 (1947) (reciting that in 1931, only 10.2% of farms had electrical service).

[2] Trachsel, *supra* note 1, at 416, 430; Pacyniak, *supra* note 1, at 428. For a fictional account of the advent of electricity in the last county in rural Ireland to secure it, *see generally* Niall Williams, This Is Happiness (2019). "When you are born in one century and find yourself walking around in another there's a certain infirmity to your footing." *Id.* at 55.

easements.[3] Across the country, rural electric cooperatives collected more than one million easements between 1935 and 1941.[4]

The Rio Grande Electric Cooperative is one such nonprofit. Founded in 1945 by ranchers in Kinney, Val Verde, Edwards, Maverick, and Uvalde counties, Rio Grande was formed to furnish "electric energy to persons in rural areas who are not receiving central station service."[5] Between one-third and one-half of Rio Grande's infrastructure is built on "legacy easements" like the Dooley Document, acquired during Rio Grande's early days. Similar documents purporting to convey easements exist throughout rural Texas.[6] Every indication is that Rio Grande acquired the Dooley Document as part of its mission to provide electric service to rural Texas.

John Boerschig purchased the thousands of acres at issue in 2002, knowing at the time that a tiny fraction of its vastness was burdened

---

[3] Pacyniak, *supra* note 1, at 472; Rural Elec. Admin., Electricity for the Farm through REA 10 (1940) ("Obviously, farmers' electric systems cannot afford to pay for [electric line] easements. To do so would make electric rates unnecessarily high. When landowners fail to give easements, lines must be rerouted, thus increasing costs. Every consumer and the community as a whole benefits when easements are signed promptly in a cooperative spirit.").

[4] Rural Elec. Admin., U.S. Dep't of Agric., Misc. Pub. No. 811, Rural Lines: The Story of Cooperative Rural Electrification 4, 8–9 (1966).

[5] Rio Grande Elec. Coop., Inc., Articles of Incorporation (July 27, 1945) (on file with Tex. Sec'y of State).

[6] *See* Letter Br. of Tex. Elec. Coops., Inc. at 5 ("It is likely that numerous utility lines across the State implicate written agreements that may not comply with the statute of frauds."); Br. of Elec. Utils. at 13, 22 (observing that electric utilities hold hundreds of thousands of historic easements and an unknown number of which may have been lost or never recorded); Letter Br. of Tex. Pipeline Ass'n. at 2, 4 (suggesting that thousands of pipeline easements are similarly informal or defective).

with the power line route in question. In June 2012, Rio Grande notified Boerschig it intended to "upgrade the existing feeder situated on a portion of your property" and it proposed to move the line "approximately 15 feet southwest." When Boerschig objected, Rio Grande attempted to reroute the line through the town of Brackettville using easements granted to another utility. Though the proposed route did not cross his land, Boerschig wrote letters to the other utility and to the City of Brackettville expressing his objections.

Boerschig eventually granted permission to Rio Grande to continue constructing the line subject to his trespass claim. Rio Grande kept the line on the footprint of the original line, even though doing so was slower, more expensive, and more dangerous.

Rio Grande completed the line in 2014. The new line has sixty poles, each forty-five feet tall, carrying seven wires on two crossarms. Because of differences in the length of the buried part, the new poles rise about seven feet higher above the ground than the old poles. The new poles are constructed of stronger, flame-resistant fiberglass composite resembling the replaced wooden poles.

At trial, Boerschig testified the new line interfered with his ranching, haying, and hunting operations on the property. Boerschig claimed to have stopped haying in one field after the construction. Boerschig described the new poles as "an eyesore" and told the jury someone had ruined a tailgate backing into one. Though he had purchased the property with the existing power line route, he believed the easement decreased the value of his property. The jury reviewed

4

photos and video taken along the power line route both before and after the reconstruction.

Rio Grande contested Boerschig's evidence. Contrary to the Court's recitation that Rio Grande offered "no evidence" that the upgrade was necessary to continue its use of the power line route, Rio Grande's witnesses described the line as a "backbone feeder" for "lots of different consumers," including Boerschig. The video of the power line route shows fields planted only on either side of the line route and no haying or farming in the area under and around the line even before the upgrade. A Rio Grande employee testified that nothing in the route interferes with haying, ranching, or hunting. The new, safer poles resemble the replaced wooden poles in style and color and have a slightly larger diameter, with some in the identical location as the replaced poles. The number of guy wires securing directional changes in the line did not increase.

The jury answered "No" when asked if Rio Grande had exceeded the scope of its easement, which the court's charge defined as a "Power Line Route"—not a particular line. Because the jury found that Rio Grande's use did not exceed the scope of the easement, the jury did not answer whether Rio Grande negligently or maliciously trespassed on Boerschig's property.

## II

## A

As a threshold matter, Rio Grande proved it held the disputed easement as a defense to Boerschig's trespass claim.[7] A claim that the holder of an easement engaged in activity exceeding the easement's scope sounds in trespass.[8] In a trespass action, it is the plaintiff's burden to show that the entry was unauthorized or without consent.[9] An easement holder has authorization to use its easement. The plaintiff recovers only to the extent he proves that the easement holder exceeds its rights in the easement.[10]

Once the jury found that Rio Grande held an easement, Boerschig bore the burden of demonstrating that Rio Grande exceeded its rights in its easement, interfering with his property beyond the easement's scope. The jury charge reflected this burden, and Boerschig raised no objection to bearing it:

---

[7] *See Bains v. Parker*, 182 S.W.2d 397, 399 (Tex. 1944) ("The burden is on the party claiming an easement in another person's land to prove all of the facts necessary to establish the easement.").

[8] *See Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 708 (Tex. 2002) (remanding for trial trespass claim against cable company that used electric easement to string cable lines in excess of express easement's terms).

[9] *Env't Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 425 (Tex. 2015).

[10] *Tex. W. Ry. Co. v. Wilson*, 18 S.W. 325, 325 (Tex. 1892) ("A party in possession of another's land, claiming an easement, is a trespasser if his claim is without foundation. If, in a suit by the owner of the soil, the plaintiff shows title to the land, and the defendant to the easement, the plaintiff recovers, subject to the right of the defendant to enjoy the easement." (quoting *Hays v. Tex. & Pac. Ry. Co.*, 62 Tex. 397, 399 (1884))).

Question 4

Did the construction of The Power Line Upgrade across John Boerschig's property exceed the scope of the prescriptive easement or easement by estoppel that you found in response to Question 2 or 3?

The scope of an easement created by prescription or estoppel is fixed by the use through which it was created.

[…]

Answer: No

Rio Grande had no need to secure a finding that its upgrade project was *inside* the scope of the easement given that the jury found Rio Grande did not venture *outside* it.[11] The jury's finding is fatal to Boerschig's trespass claim, but the Court ignores it even though "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."[12]

## B

The scope of an express easement is relatively straightforward: the terms of the writing establish the purpose of an easement and define its scope.[13] An easement by estoppel, in contrast, lacks an enforceable writing. Like all easements, however, easements by estoppel are granted

---

[11] The trial court awarded declaratory relief to Rio Grande. To the extent that an affirmative finding is necessary to support a declaratory judgment, the Court could modify the judgment to a take-nothing judgment. Boerschig, however, did not seek such relief in the lower courts.

[12] *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

[13] *Marcus Cable*, 90 S.W.3d at 700–01.

for a specific purpose.[14] The easement's existence implies a grant of use to reasonably achieve that purpose without unreasonably burdening the servient estate.[15] Under the common law, "the manner, frequency, and intensity of an easement's use may change over time to accommodate technological development" so long as the changes "fall within the purposes for which the easement was created."[16]

The Court defines the reliance interest as "the actual investment (or other change of position) that the holder made to use the land."[17] Easements are definitionally nonpossessory interests that permit the holder to *use* the land for a particular purpose.[18] The Court's overly narrow definition of reliance reduces Rio Grande's acknowledged right to use the land—to operate a power line route across it—to existing poles and wires. In doing so, it slights the route's existing *use* as a "backbone feeder."

The possession of land that accompanies use rights is evidence—perhaps the best evidence—of the use, but occupation is not the only evidence defining the use. The reliance interest includes closely related ancillary activities necessary to maintain and continue the *use* that do not materially interfere with the burdened landowner's use and

---

[14] *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 211 (Tex. 1962); *see Severance v. Patterson*, 370 S.W.3d 705, 721 (Tex. 2012) (discussing easements generally).

[15] *Severance*, 370 S.W.3d at 721.

[16] *Marcus Cable*, 90 S.W.3d at 701 (citing Restatement (Third) of Property (Servitudes) § 4.10).

[17] *Ante* at 21.

[18] *E.g.*, *Marcus Cable*, 90 S.W.3d at 700.

8

enjoyment of his land.[19] Other state high courts recognizing easements by estoppel have recognized ancillary uses, such as the right to access the property and to make necessary repairs.[20] In *Hager v. City of Devils Lake*, the Supreme Court of North Dakota held that the easement holder's right to maintain a sewage system included the right to construct a new culvert and drainage ditches necessary to the function of the system.[21] To determine whether a use is sufficiently closely related so as to come within the scope of the easement, a jury may consider testimony regarding the activity's necessity to maintain the existing use

---

[19] *Cf. Severance*, 370 S.W.3d at 721 ("The existence of an easement 'in general terms implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner.'" (quoting *Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex. 1974))); *see also Whaley v. Cent. Church of Christ of Pearland*, 227 S.W.3d 228, 231–32 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding that the scope of an easement by estoppel to erect a sign included the right to access the sign for maintenance or repair, and therefore judgment granting sign owner an easement to an area larger than the existing sign by one foot in each dimension was not arbitrary or capricious); *N. Clear Lake Dev. Corp. v. Blackstock*, 450 S.W.2d 678, 681, 684 (Tex. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e) (holding that although grantees made different uses of the waterfront property establishing their reliance interest, all the grantees were entitled to the same judgment of easement by estoppel to use the property for installing and maintaining bulkheads, boat slips, boat houses, utilities, and landscaping).

[20] *See, e.g.*, *Ricenbaw v. Kraus*, 61 N.W.2d 350, 355 (Neb. 1953); *Stoner v. Zucker*, 83 P. 808, 809 (Cal. 1906).

[21] 773 N.W.2d 420, 425, 437 (N.D. 2009). Even more broadly, the Supreme Court of North Carolina held that a landowner who was estopped from denying the existence of public roads the landowner had platted but not yet conveyed was further estopped from seeking damages related to the installation of public utilities, as the latter is presumed by acquiescence to the former. *Smith v. City of Goldsboro*, 28 S.E. 479, 480 (N.C. 1897).

and the extent to which that use materially increases the ongoing burden of the easement.[22]

Rio Grande's use of the land—as an operable power line route—burdens the land through the physical manifestation of the poles and lines. Rio Grande may make "unlimited reasonable use" necessary to reasonably achieve its purpose of operating a power line route, so long as it does not materially increase the burden to the landowner.[23] Both questions—whether the activity is necessary to carry on the use and whether the activity materially increases the burden on the land—may be fact questions.[24]

In this case, the facts are disputed. As to necessity, the jury heard Rio Grande relies on the power line route to serve thousands of customers. Rio Grande told the jury that Rio Grande has no discretion to refuse to meet its customers' power needs, that the reconstruction of the line was necessary to serve the needs of a utility customer and to improve reliability of the system, and that the upgrade made the line safer. The jury reasonably concluded that Rio Grande relied on the easement to transmit electricity in the footprint of the route and the upgrade was necessary to continue using the easement to serve existing customers.

---

[22] *See, e.g.*, *Holm v. Davis*, 125 P. 403, 407 (Utah 1912) (instructing that the right to ancillary uses of easement, like maintenance, are informed by whether the work was necessary and performed without unnecessary damage or injury).

[23] *Severance*, 370 S.W.3d at 721 (quoting *Coleman*, 514 S.W.2d at 903).

[24] *Cf. Viscardi v. Pajestka*, 576 S.W.2d 16, 17 (Tex. 1978) (holding that the existence of an easement by public dedication is a question of fact).

Boerschig did not present evidence that the upgrade was unnecessary to continue Rio Grande's existing use of the route. Instead, Boerschig argued that the upgrade is more burdensome to his use and enjoyment of his ranch. Rio Grande countered with competing evidence: that, while the poles were seven feet taller above ground and greater in number, the upgrade was no more intrusive to ranch operations than Rio Grande's historic use of the route. The jury also heard that Rio Grande had taken steps to burden the ranch as little as possible, such as designing the poles to have a similar look to the earlier ones and placing the new line in the existing footprint at considerable expense. The jury viewed photographs and videos of the entire power line route before and after the upgrade. Seeing that most of the power line route had been and remained uncultivated and populated by deer, the jury may have credited the testimony that the upgraded line did not interfere with haying, ranching, or hunting. Based on this video evidence, the jury may have discredited Boerschig's testimony that the increased number of poles prevented the continuing and customary use of the ranch or further decreased its value. The jury reasonably concluded that reconstruction of the line imposed no material additional burden on the property.

The Court acknowledges that whether activities like "access, repairs, and maintenance of the area" are reasonably necessary to use and enjoy the easement may present a jury question.[25] But the Court's calcified definition of reliance takes that question—both the necessity

---

[25] *Ante* at 24.

and the burden aspects—out of a jury's hands. To the Court, any and every improvement that departs from the existing infrastructure is—as a matter of law—a trespass. Under the Court's legal definition of the easement, Rio Grande's investment is poles and wires, not an interconnected, operable, and soon-to-be overtaxed power line route. The Court denies Rio Grande the right to add a single pole or to replace the sixty-year-old wooden poles with safer, fireproof composite poles. If fire destroyed the line, it appears the Court would declare the reliance terminated, forcing Rio Grande to recondemn an easement it holds. The Court pledges that a utility wishing to add to its footprint "may offer evidence that changes or replacements to its line are necessary to protect its investment made in reliance on the landowner's representations."[26] Rio Grande offered such evidence: the reconstruction was necessary to protect its investment in its power line route—and the jury believed it. The Court's rule undoes the work of the civic-minded amateurs who neglected to record their paperwork in an era of urgency and cooperation many decades ago.

Amici warn us that many similarly imperfect easements undergird rural Texas's infrastructure. By classifying every upgrade project as a trespass—in the face of a jury verdict to the contrary—the Court hands a windfall to landowners like Boerschig, who took with notice of the route.[27] Prudence counsels that utility rights, once

---

[26] *Ante* at 27 n.25.

[27] *See also Boerschig v. Sw. Holdings, Inc.*, 322 S.W.3d 752, 757 (Tex. App.—El Paso 2010, no pet.) ("Boerschig sued SHI, alleging, among other things, that: (1) SHI trespassed by using a portion of the Morita Road that was

---

acquired, must be accompanied by the right to make reasonable repairs and improvements to continue operation along the route. As the Court acknowledges but does not implement, a jury is the proper body to determine whether such repairs or improvements are necessary to continue the *use* of the easement.

## C

A known or apparent encumbrance provides notice and informs the purchaser's valuation of the land before the transfer.[28] The purchaser takes the property not just with the physical manifestation of the encumbrance but also with notice of the closely related ancillary uses a reasonable buyer would presume accompany the encumbrance.[29]

on his property; (2) SHI violated the express easement by using it for its invitees to access a resort rather than a ranch, and to access nonappurtenant properties; and (3) SHI trespassed by erecting a fence on the Morita Road."); *Boerschig v. Trans-Pecos Pipeline, L.L.C.*, 872 F.3d 701, 709 (5th Cir. 2017) (affirming denial of Boerschig's preliminary injunction against condemnation for a pipeline); *Wheeldon v. ELK Feed Grounds House, LLC*, 488 P.3d 916, 918 (Wyo. 2021) ("Elk Feed's sole member, John Boerschig, knew the Wheeldons claimed they had an implied easement across Tract 2, but he purchased the property believing their claim had no merit.").

[28] *See Hamrick v. Ward*, 446 S.W.3d 377, 383 (Tex. 2014) (discussing, in the context of prior use easements, the presumption that parties consider open and visible conditions in contracting for the purchase of land); *see also, e.g.*, *Magnuson v. Coburn*, 46 N.W.2d 775, 777–78 (Neb. 1951) (estopping subsequent purchaser from interfering with unrecorded easement where use of the easement was open and visible). This Court has held that features of an adjoining parcel could also put a buyer on notice of a claimed easement even though the easement remained unimproved. *F.J. Harrison & Co. v. Boring & Kennard*, 44 Tex. 255, 264 (1875).

[29] *See Case v. Hoffman*, 75 N.W. 945, 947 (Wis. 1898) (holding that plaintiff's open enjoyment of canal on subsequent purchaser's land was adequate notice of plaintiff's claimed rights in the canal, and that subsequent purchaser may be required to erect bulkhead to preserve plaintiff's use rights);

As with the reliance element, the Court treats notice as a question of law even though, if disputed, "actual notice is always a question of fact."[30] Boerschig could *see* the 1947 line, explains the Court, and thus he cannot be charged with notice of what the existence of an operable power line route *means*. "Actual notice is personal knowledge or 'those things which a reasonably diligent inquiry *and exercise* of the means of information at hand would have disclosed.'"[31]

In holding that Boerschig lacked notice as a matter of law, the Court intrudes upon another factual domain. Boerschig did not ask the jury about notice or attempt to assume bona fide purchaser status. In any event, the record shows that Boerschig had notice, not merely of seventeen wooden poles constituting an existing sixty-year old power line route, but that the route was operable and required maintaining and *operating* it as a power line route. Boerschig acknowledged that operating a power line route involves more than continued presence of existing poles: the operator has a right to ancillary uses, such as ingress and egress, tree trimming, and maintenance that are necessary to continue to make the same use of the route. The continuing maintenance of an apparent and visible power line route supports the jury's implied

---

*Snowden v. Wilas*, 19 Ind. 10, 14–15 (1862) (overturning verdict because presence of mill and dam on adjoining property may put subsequent purchaser on notice of an easement by estoppel to overflow purchaser's land).

[30] *Flack v. First Nat'l Bank of Dalhart*, 226 S.W.2d 628, 632 (Tex. 1950) (quoting *Hexter v. Pratt*, 10 S.W.2d 692, 693 (Tex. Comm'n App. 1928)).

[31] *425 Soledad, Ltd. v. CRVI Riverwalk Hosp., LLC*, 709 S.W.3d 551, 560 (Tex. 2024) (emphasis added) (quoting *Flack*, 226 S.W.2d at 632); *see also F.J. Harrison*, 44 Tex. at 264 (declaring that a reasonably prudent buyer would understand that features on an adjoining lot indicate a claimed easement).

finding that Boerschig had notice that a utility claimed a right to operate the line, inclusive of necessary reconstruction of the line, so long as it did not materially increase the burden the easement presented to Boerschig's property.

*　　*　　*

Boerschig made his best case to a jury of his neighbors that Rio Grande's "power line upgrade"—to include extra poles to improve the safety and reliability of its electrical service—was outside the scope of Rio Grande's easement. His neighbors simply did not believe him. The Court does. It is not, however, our role to supplant the jury's credibility determinations.[32]

Easements by estoppel support necessary activities that do not materially increase the burden they impose. When this evidence is disputed, the scope of an easement by estoppel presents a fact question. Because legally sufficient evidence supports the jury's resolution of the fact questions as to the scope of Rio Grande's easement, we should affirm. As we do not, I respectfully dissent.

Jane N. Bland<br>
Justice

**OPINION FILED:** May 22, 2026

---

[32] *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony . . . . Reviewing courts cannot impose their own opinions to the contrary.").