## GREEN et al. v. WEST TEXAS COAL MINING & DEVELOPING CO.
### (No. 6217.)

(Court of Civil Appeals of Texas. Austin. Oct. 20, 1920. Rehearing Denied Nov. 24, 1920.)

**1. Mines and minerals ⬦⬌55(5)—Deed held to have conveyed all minerals in land.**

A deed conveying all mineral to be found on certain lands *held* to have conveyed all the minerals in the land, "and all other minerals that may be found by the said [grantee]," being intended to enlarge the description of minerals specifically mentioned.

**2. Husband and wife ⬦⬌15(4)—Conveyance by husband and wife of all minerals in homestead lands held joint.**

Deed to defendant's predecessor executed by plaintiffs, husband and wife, and owners of a homestead in the land, conveying all minerals therein, *held* a joint conveyance.

**3. Mines and minerals ⬦⬌55(2)—Conveyance of minerals held a warranty deed, and not a mere quitclaim.**

Mineral deed to defendant's predecessor executed by plaintiffs, husband and wife, owners of a homestead interest in the lands, containing in the granting clause the words, "bargain, sell, and convey," and in the habendum clause "to have and to hold the above-described mineral interest," and in the warranty clause the words "warrant and forever defend all and singular the said mineral interest," in view of the circumstances indicative of the grantors' intention, *held* a warranty deed, and not a mere quitclaim.

**4. Deeds ⬦⬌25—Use of word "quitclaim" not conclusive as to character of conveyance.**

The use of the word "quitclaim" in a deed is not conclusive evidence as to the character of the conveyance.

**5. Mines and minerals ⬦⬌55(2)—Grant of "all of our interest" would have rendered conveyance a quitclaim, nothing else appearing.**

The words "all of our interest," embraced in a deed to defendant's predecessor, executed by plaintiffs, husband and wife, and owners of a homestead, of all the minerals in the land, nothing else appearing, would have rendered the conveyance a quitclaim deed as to the part of the land involved.

**6. Deeds ⬦⬌93—Intention of parties prevails in determining whether conveyance warranty or quitclaim.**

The intention of the parties, as appears from the language used, must prevail in determining whether a conveyance was a warranty or a quitclaim deed.

**7. Deeds ⬦⬌100—Court must look to circumstances surrounding parties.**

Where ambiguity as to whether a conveyance was a warranty or a quitclaim deed arises from the language used, the court must look to the circumstances surrounding the parties at the time of the conveyance, to aid it in ascertaining the intention, which controls.

**8. Estoppel ⬦⬌38—Subsequently acquired legal title inured to benefit of grantee under warranty.**

Where a grantor by warranty deed subsequently acquired legal title to the land, it inured to the benefit of his grantee by virtue of his warranty.

**9. Estoppel ⬦⬌49—Grantor by warranty deed, by paying balance of price due from him, did not acquire superior title to that conveyed.**

The grantor of minerals in land purchased by him from the state, and on which he owed the state a balance, did not, by paying the balance of the purchase money to the state, obtain a different and superior title to that which he had conveyed away, but only the same title freed from the claims of his vendor, the state.

**10. Mines and minerals ⬦⬌49—Vendor's possession adverse to vendee, except where minerals alone sold.**

A vendor's possession, in the absence of circumstances showing the contrary, is adverse to his vendee; but such is not the case where the vendor remaining in possession has sold the minerals, but not the surface.

**11. Homestead ⬦⬌42—Designation of tract in manner provided not necessary to establish right.**

Designation of homestead in the manner provided by statute is not necessary to establish a homestead right, but is contemplated only where the head of a family has more than 200 acres, which have been impressed with the homestead character, and desires to withdraw the excess from homestead protection.

Error from District Court, Coleman County; J. O. Woodward, Judge.

Suit by M. E. Green and others against the West Texas Coal Mining & Developing Company. To review a judgment for defendant, with an exception, plaintiffs bring error. Affirmed.

Critz & Woodward, of Coleman, for plaintiffs in error.

J. W. Powell, of Ballinger, and Snodgrass, Dibrell & Snodgrass, of Coleman, for defendant in error.

### Findings of Fact.

JENKINS, J. Except as to the Barnecoat survey, we adopt the following from the brief of defendant in error, which will hereinafter be referred to as the defendant, as our findings of fact:

"The following are undisputed facts in the case:

"That J. H. Green and W. S. Green, on March 5, 1892, owned in fee simple the 136 acres of land out of the Conrad Motch survey, the minerals in which are in controversy, and that they were owners of the north one-half of E. T. R. R. Co., section 88; unpatented land,

---

⬦⬌For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

under purchase from the state which was then in good standing, and that W. S. Green was the owner of the southeast one-fourth of E. T. R. R. Co., section 88, unpatented land, under purchase from the state which was then in good standing; that on said March 5, 1892, the said J. H. Green and W. S. Green, without joinder by their wives, executed, duly acknowledged, and delivered a mineral deed to J. I. Huffman, the body of which is in words, figures, and substance as follows, to wit:

"'Whereas, on the 26th day of June, A. D. 1889, J. H. Green and W. S. Green, of the above state and county, did enter into a written contract with J. I. Huffman, of the state of Texas and county of Tom Green, in which contract we did bargain, sell, and convey unto the said J. I. Huffman all the mineral, etc., to be found in or on certain lands, fully described therein, upon his fulfilling certain obligations set out in said contract; and whereas, a misunderstanding has arisen as to what constitutes a strict compliance with or fulfillment of said contract on the part of the said J. I. Huffman; and whereas, we, J. H. and W. S. Green are desirous of entering into a new contract, that all possibilities of any future misunderstanding may be avoided; and whereas, it meets with the consent and approval of the said J. I. Huffman to accept this as a new contract and sale, he agreeing to accept same, instead of the first, thereby annulling said first contract:

"'Now, therefore, know all men by these presents that for and in consideration of the foregoing, and the further considerations hereinafter specified, we, the said J. H. and W. S. Green, have bargained, sold, and conveyed, and by these presents do bargain, sell, transfer, and convey, unto the said J. I. Huffman all mineral of whatsoever kind or quality, such as gold, silver, copper, iron, coal, oil, gas, and all other minerals or valuable substance found or to be found by the said J. I. Huffman or his legal representatives, by boring, drilling, or in any other manner, to develop such mineral or substance on or in the following described tracts of land, to wit:

"'One hundred and thirty-six acres out of the Conrad Motch survey in Coleman county, Texas, by patent No. 530, Cert. 10,072, and described by metes and bounds as follows: Beginning at a st. made for the S. E. cor. of said sur. being the middle S. E. cor. of same and the N. W. cor. of the Henry Sacket sur., fr. wh. a P. O. brs. N. 80° E. 16 vrs., and a do (now a stump) brs. N. 8 E. 5 vrs.; thence E. 620 vrs. to stk. and md., fr. wh. a P. O. brs. N. 71½° E. 6 vrs., do S. 32¼° W. 5 vrs.; thence N. 1,242 vrs. to stk. and md.; thence W. 620 vrs. to stk. and md.; thence S. 1,242 vrs. to the place of beginning, and containing 136 acres. Also all of our interest in the north half of section No. 88, E. T. R. R. Co., on the waters of Jim Ned creek in Coleman county, and adjoining the above tract of land. Also all of our interest in the southeast quarter of said section No. 88, lying north of the Coleman and Comanche road. It is understood that we have sold about 18 acres off the east end of the north half of section 88, said E. T. R. R. Co., to J. J. Fry, which is not herein included.

"'To have and to hold the above-described mineral interest, together with all and singular the rights and appurtenances thereto in any wise belonging, unto the said J. I. Huffman and his heirs and assigns forever. And we do hereby bind ourselves, our heirs and executors and adminstrators, to warrant and forever defend all and singular the said mineral interest unto the said J. I. Huffman, and his heirs and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

"'The further consideration, covenants, and agreements are: That the said J. I. Huffman pay to us, the said J. H. and W. S. Green, one and 50/100 ($1.50) dollars per acre for the mineral existing in or on the above described land, as follows: $50.00 cash in hand paid, the receipt of which is hereby acknowledged; also one note for the sum of $100.00, due on the 10th day of May, 1892; and the balance to be paid in five equal annual installments as follows: One-fifth of balance to be paid on the 10th of January, 1893, one-fifth on the 10th of January, 1894, one-fifth on the 10th of January, 1895, one-fifth on the 10th of January, 1896, and one-fifth on the 10th of January, 1897. Above payments are not evidenced by notes, but are to be made promptly as the time of maturity of each arrives. It is understood and agreed, however, that the said J. I. Huffman has the privilege of paying any one or all of the above installments before they are due, if he so desires.

"'Now, in case the said J. I. Huffman fails or refuses to pay any one of the above installments at maturity, then this failure shall work a complete forfeiture of this contract and conveyance, and said forfeiture shall operate as a release, so that all property and interests herein conveyed to the said J. I. Huffman shall revert to and vest in us, the said J. H. and W. S. Green, as completely as it was before the making and signing of the first contract herein mentioned, and this without suit in court. And we, the said J. H. and W. S. Green, agree that the said J. I. Huffman shall have free and full access to, from, and over said lands, such as roadways, tramways, and railways, to enable him to transport coal or other valuables over and from said land; also all easements, rights, and privileges necessary or incident to the search or development of coal or other valuables found or that may be found by the said J. I. Huffman or his legal representatives; also shall have the privilege of erecting tents, cabins, and corrals for the purpose of enabling him to carry on the mining business (no camp or corral, however, to be erected nearer the residence of either J. H. or W. S. Green than one-fourth of a mile); also all and full privileges to sink shafts, run tunnels, drive entries, lay pipes and conduits, erect dams, coal chutes, and shall have all privileges necessary or incident to the carrying on of the mining business; yet the said J. I. Huffman shall have no further use or privileges of the surface of the land herein described than is necessary for him or his legal representatives to carry on the mining business. And we further agree that the said J. I. Huffman shall have full privilege to remove at any time any and all improvements that he may erect on the aforesaid land.

"'It is further understood and agreed that,

if the said J. I. Huffman shall desire to sink a shaft on any valley land, or any farm land, or any land that is valuable to us for building sites, that is to say, should he desire to sink a shaft on any other of the herein described land, except rough land or hill land, he shall pay to us all damages arising thereby, which shall be assessed against him by three disinterested parties (should we fail to agree upon the amount of said damages) for the use of so much of the surface as he may require for said purposes. It is further understood that the said J. I. Huffman or his legal representatives shall confine all camps and corrals within one-quarter of a mile of any shaft that he or they may be encamped about, and that no stock used by him, his employees, or his legal. representatives, or their employees, shall be allowed to go loose on the land herein described, without the consent of us, the said J. H. and W. S. Green; neither shall any timber be used by the said J. I. Huffman or his legal representatives, without the consent of said J. H. and W. S. Green. And it is especially agreed and understood by us, the said J. H. and W. S. Green, that, should we desire to sell the herein described land before having paid the full amount of balance due the state of Texas, then and in' that case we must pay said balance to the state, out of the proceeds of said sale, that the said J. I. Huffman may be protected from loss. The words "without sufficient cause," found in lines 10 and 11 of page 3 of this contract were erased before signing.

" 'Witness our hands at Coleman, Texas, this the 5th day of March, A. D. 1892.'

"That said mineral deed was duly filed for record in the office of the county clerk, Coleman county, Texas, January 9, 1897, and recorded in Book 35, page 521, of the Deed Records of Coleman county, Texas, and that on January 9, 1897, J. H. Green and W. S. Green executed a formal and complete release, the body of which is in words, figures, and substance as follows, to wit:

" 'That we, J. H. Green and W. S. Green, did on the 5th day of March, 1892, execute a deed of conveyance to J. I. Huffman of all the coal and other mineral situated in the following tracts of land, to wit: 136 acres out of the Conrad Motch survey in Coleman county, Texas. Pat. No. 530, Cert. 10072; also all of their interest in the north half of section No. 88, E. T. R. R. Co., on the waters of Jim Ned creek in Coleman county, and adjoining the above tract of land; also all our interest in the southeast quarter of said section 88, lying north of Coleman and Comanche road. All of said property situated in Coleman county, Texas. And whereas, said conveyance specified certain conditions and yearly payments on the part of said J. I. Huffman, all of which payments have been fully met and satisfied, and this writing is intended to acknowledge full receipt and to complete the conveyance mentioned in said above-mentioned contract or deed, and make said transfer absolute, and said instrument is referred to and made a part of this instrument for more full description, and is now on record in the Deed Records of said Coleman county, in Book 35, page 521.

" 'In witness whereof, we have this day, January 9, 1897, signed the same.'

"That said release was duly filed for record January 30, 1897, and recorded in Book 35, page 568, of the Deed Records of Coleman county, Tex.; that on August 20, 1897, the north half of section 88 was forfeited for nonpayment of interest; and that on November 29, 1897, W. S. Green filed his application to purchase said north half of section 88, and same was awarded to him June 21, 1898. That on April 4, 1898, the southeast one-fourth of section 88 was forfeited for nonpayment of interest and reinstated May 9, 1898.

"That W. S. Green died on October 4, 1903. That the north half of E. T. R. R. Co., section 88, was patented to the heirs of W. S. Green March 16, 1904. That the southeast one-fourth of E. T. R. R. Co., section 88, was patented to W. S. Green September 15, 1904. That W. S. Green died intestate, and that the plaintiffs in error, excepting J. T. Garrett, who in a lessee of his coplaintiffs, are the widow and all the children and the only heirs of W. S. Green, deceased. That the said J. H. Green and W. S. Green, and after the death of W. S. Green the widow and the children of W. S. Green, deceased, were in the actual and peaceable possession of the surface of the lands and premises in controversy continuously from the date of said mineral deed to J. I. Huffman up to the time of the institution of this suit. That the said J. I. Huffman and his assigns went in and upon said lands from time to time, worked a coal shaft for two or three winters, and sunk a prospect well on the lands, and that no objection was ever made by J. H. Green, W. S. Green, or his widow or children to the said J. I. Huffman or his assigns entering upon said lands to prospect for the minerals until the institution of this suit. That no prospecting, drilling, and no operations of any kind or character whatsoever for the discovery or the development of said lands as mineral producing properties, and no appropriation of any of the minerals in said lands was ever made by the said J. H. Green, W. S. Green, nor by the widow, nor by the children and heirs, nor by any person whomsoever claiming adverse to the said J. I. Huffman and his assigns after the execution of said mineral deed by J. H. and W. S. Green to J. I. Huffman. That the defendant in error, West Texas Coal Mining & Developing Company, has acquired all the mineral interests, and is the present owner of all the mineral interests so conveyed to the said J. I. Huffman by the said J. H. Green and W. S. Green. That the minerals were never rendered for taxation separate and apart from the surface, and no taxes have ever been paid on the land or minerals by the defendant in error; but that the plaintiffs in error have paid the taxes on the land as a whole ever since March 5, 1892.

"It is a further undisputed fact that the said W. S. Green, at the time he executed said mineral deed, March 5, 1892, to J. I. Huffman, lived and had his residence and improvements on that part of the southeast quarter of E. T. R. R. Co., section 88, lying south of the Coleman and Comanche road, containing more than 50 acres of land, and also owned and used in connection therewith 162 acres of land out of the Barnecoat survey, a part of which was in

cultivation and which 162 acres was on the south side of the Coleman and Comanche road, and which was used in connection with the 50 or more acres out of the southeast quarter of section 88 for homestead purposes. That the 136 acres out of Conrad Motch survey, all of the north half of the E. T. R. R. Co., section 88, and part of the southeast quarter of section 88 was all on the north side of the Coleman and Comanche road, and at the time of the execution of said mineral deed to Huffman had no residence nor barn thereon, and very little, if any, of said land was in cultivation, and the said lands were used chiefly for pasturage purposes by the said J. H. Green and W. S. Green."

As to the Barnecoat survey, we find that, at the time the deed was executed to Huffman, J. H. and W. S. Green were the joint owners of 324 acres out of said survey, a portion of which was in cultivation. In 1914, after the death of W. S. Green, in a partition suit between J. H. Green and the heirs of W. S. Green, the latter were awarded the north half of the Barnecoat tract, lying east and adjoining the fifty acres of the southeast quarter of section No. 88, south of the public road. Of this half (162.2 acres) there were about 100 acres in cultivation. The use of the Barnecoat survey by W. S. Green during his lifetime was such as to impress upon it a homestead character in his undivided interest therein; and such use as to the north half had been continued by his surviving widow to the time of the trial hereof.

We further find that the use by W. S. Green of that part of section 88 lying north of the road, as well as that lying south of the road, was such as to impress upon it the homestead character prior to the execution of the mineral deed to J. I. Huffman, and that such use was continued by him and by his surviving widow to the date of the trial hereof. Neither W. S. Green nor his surviving widow has ever designated their homestead in the manner provided by statute, nor in any other manner, unless the deed to Huffman constituted such designation.

Judgment was rendered for defendant, except as to the southeast quarter of section 88, for which judgment was rendered for plaintiffs in error, hereinafter styled plaintiffs.

## Opinion.

The issues presented on this appeal are: (1) The construction of the deed—whether it is (a) to the minerals in place; (b) joint or several; (c) warranty or quitclaim. (2) Limitation. (3) Homestead.

[1] 1. We do not think that there is any merit in the suggestion that the deed does not purport to convey the minerals in the land. The words "and all other minerals that may be found by the said J. I. Huffman" are intended to enlarge the description of minerals specifically mentioned. Scott v. Laws, 185 Ky. 440, 215 S. W. 81.

[2] 2. We hold that the deed is a joint conveyance. 15 C. J. 1223, § 22; Ashburn v. Watson, 8 Ga. App. 566–569, 70 S. E. 19.

[3, 4] 3. The words in the granting clause, "bargain, sell, and convey unto J. I. Huffman all the minerals * * * in the following described tracts of land;" in the habendum clause, "to have and to hold the above-described mineral interest;" and in the warranty clause, "warrant and forever defend all and singular the said mineral interests"— clearly indicate, when considered without reference to any clause showing otherwise, if such there be, that the instrument set out in our findings of fact is a warranty deed to the minerals in the three tracts of land therein described. We think the words "mineral interests," as here used, mean the mineral, and that this term was used because the parties had in mind that it was the mineral, and not the surface of the land that was being conveyed, or, as a layman might say, the mineral and not the land. This construction of the deed is aided by the release executed by the Greens, which, after reciting the payment of the balance of the purchase money, concludes with this language:

"This writing is intended to * * * make said transfer absolute."

Assuredly the conveyance is a warranty deed to the mineral in the Motch survey. The language of the granting clause, when considered by itself, is applicable alike to all of the surveys thereinafter described. So, also, are the habendum and warranty clauses. It is usual, in quitclaim deeds to use the word "quitclaim." While it is not necessary to use this word, if it otherwise appears that it was the intention to make a quitclaim conveyance, we think the failure to use the word "quitclaim" is not without significance. Even the use of the word "quitclaim" is not conclusive evidence as to the character of the conveyance. Allen v. Anderson, 96 S. W. 55; Abernathy v. Stone, 81 Tex. 430, 16 S. W. 1102; Moore v. Swift, 29 Tex. Civ. App. 51, 67 S. W. 1065; Garrett v. Christopher, 74 Tex. 453, 12 S. W. 67, 15 Am. St. Rep. 850; Thredgill v. Bickerstaff, 87 Tex. 522, 29 S. W. 356.

[5] 4. The contention of the plaintiffs is that the words "all of our interest" make the conveyance a quitclaim deed as to the north half of the southeast quarter of section 88. If nothing appeared in the deed to the contrary, we think this contention would be correct. Greer v. Willis, 81 S. W. 1185.

[6, 7] The intention of the parties, as appears from the language used, must prevail. Where ambiguity arises from the language used, we must look to the circumstances surrounding the parties at the time of such con-

veyance, to aid us in ascertaining such intention. Allen v. Anderson, supra; Harrison v. Boring, 44 Tex. 255, 263; Thorn v. Newson, 64 Tex. 164, 53 Am. Rep. 747; Carelton v. Lambardi, 81 Tex. 357, 16 S. W. 1081; Moore v. Swift, supra.

[8] What were these circumstances? Huffman desired to own the minerals in all of the three tracts of land. The Greens, for the consideration paid them, intended to convey title to these minerals, at least so far as they were able to do so. They owned the Motch tract in fee simple. They owned the title to section 88 as against all the world, except the state of Texas, and the title would become good as against the state upon their paying the purchase money and interest in accordance with their contract. This we think it was contemplated they should do. We infer this from the following language in their deed:

"And it is especially agreed and understood by us, the said J. H. and W. S. Green, that should we desire to sell the herein described land before having paid the full amount of balance due the state of Texas, then and in this case we must pay said balance out of the proceeds of said sale, that the said Huffman may be protected from loss."

We think the warranty clause was intended to bind the grantors to perfect their title, by the payment of the balance due the state; in other words, that it was a warranty of title to the minerals, and that the words "our interest" were used, for the reason that the title they then had to section 88 was only an equitable title. W. S. Green having subsequently acquired the legal title to section 88, the same, by virtue of his warranty, inured to the benefit of Huffman. Logue v. Atkeson, 35 Tex. Civ. App. 303, 80 S. W. 137; Baldwin v. Root, 90 Tex. 553, 40 S. W. 3.

[9] 5. The southeast quarter of section 88 was also forfeited; but this is immaterial, inasmuch as such forfeiture was set aside. Such being the case, if the deed conveyed the mineral therein, as we hold it did, it is immaterial whether such deed was a quitclaim or a warranty. W. S. Green did not, by paying the balance of the purchase money, obtain a different and superior title to that which he had conveyed to Huffman, but only the same title freed from the claims of his vendor, the state. Hollis v. Myers, 179 S. W. 57.

[10] 6. The plaintiffs claim title to all the minerals in each of the surveys, under the 10-year statute of limitation. They and those under whom they claim had been in possession of the surface of the lands, under such circumstances as would have given them title, if their possession was adverse to defendant. A vendor's possession, in the absence of circumstances showing the contrary, is adverse to his vendee. Such, however, is not the case where the vendor remaining in possession has sold the mineral in the land but not the surface. 1 Cyc. 994. The continued possession of the surface by the vendor in such case, except so much thereof as the vendee may want to use for mining purposes, is contemplated in such transaction. The vendee of the mineral has no right to object to such continued possession of the surface by the vendor; consequently he is not required to bring suit to establish his right to the mineral, until the vendor has done some act showing that he has repudiated the title to the mineral conveyed by his deed to his vendee, such, for instance, as beginning mining operations thereon for his own benefit. The failure of the owner of the mineral to begin mining operations, or to continue such operations, if not required so to do by the terms of his contract, would be no indication that the continued possession of the surface by his grantor was a repudiation of the grantee's title to the mineral. After the estate in the mineral has been severed by grant, possession of the surface by the grantor is not possession of the mineral, and is therefore not adverse to the owner of the mineral. Northcut v. Church, 135 Tenn. 541, 188 S. W. 220, Ann. Cas. 1918B, 545; Murray v. Allard (Tenn.) 43 S. W. 360, 39 L. R. A. 249, 66 Am. St. Rep. 740; Manning v. Coal Co., 181 Mo. 359, 81 S. W. 145; Scott v. Laws, 185 Ky. 440, 215 S. W. 81; Gordon v. Park, 219 Mo. 600, 117 S. W. 1163; Thornton on Oil and Gas, p. 490; 18 R. C. L. pp. 1173–1178; 2 C. J. 147; 1 Cyc. 994.

[11] 7. There remains to be considered only the issue of homestead. As stated in our findings of fact, the homestead character had been impressed upon all of the southeast quarter of section 88 (161 acres), long prior to the transfer of the mineral therein by W. S. Green. At that time he owned only an undivided interest in the Barnecoat survey. He continued to reside upon that part of said southeast quarter of the section south of the road, and to use that part of same lying north of the road for pasturage, and perhaps farming some to a limited extent, to the time of his death; and his surviving widow had continued such use and occupancy to the time of the trial. Neither W. S. Green nor his surviving widow ever designated their homestead in the manner provided by statute, which is not necessary in order to establish a homestead right, but is contemplated only where a head of a family has more than 200 acres which has been impressed by its use with the homestead character, and desires to withdraw the excess from the homestead protection.

Under the facts of this case, we cannot say that the trial court erred in holding that execution of the mineral lease upon that portion of section 88 lying north of the road was not, in effect, the designation as his homestead of that part lying south of the road and 140 acres of his interest in the

Barnecoat survey, to which no mineral deed was given.

For the reasons stated, the judgment of the trial court is affirmed.

Affirmed.