

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00050-CV

_____

PSQ BARBIE, LP AND PARKWOOD CONSTRUCTION, LLC, Appellants

V.

JEFFREY HOWARD, JOANNE HOWARD, JAMES CHANG, KEITH KUNKLE, AND RYAN STOKES, Appellees

---

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-304794-18

---

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

## I. Introduction

The trial court granted a motion for summary judgment brought by Appellees Keith Kunkle, Ryan Stokes, Jeffrey Howard, Joanne Howard, and James Chang (collectively, the Homeowners) and declared that they owned a 12-foot drive crossing their properties (Lots 1-R-2, 1-R-3, and 1-R-4, respectively) and that the 12-foot drive was not burdened by an express or implied easement. The trial court permanently enjoined Appellants PSQ Barbie, LP and Parkwood Construction, LLC (collectively, the Developers), who owned the adjoining property, from entering upon the drive without the Homeowners' permission.

In three issues, the Developers appeal, complaining that the trial court erred by granting the Homeowners' motion because "there are incorrectly decided material issues of law"; because an easement by estoppel was created in their favor; and because the trial court improperly declared void a 2018 easement agreement "despite clear reservations" in the Homeowners' title-commitment documents and the plat and condominium declaration of covenants, conditions, restrictions, and easements (CCRs) governing the Homeowners' properties. Because the trial court did not err by granting the Homeowners' motion, we affirm.

## II. Background

### A. Factual summary

In December 2016, Fort Linwood, LLC sold Lot 2, Block 11 in the Weisenberger addition to Parkwood. On September 18, 2017, Fort Linwood emailed to Parkwood an "access easement" agreement pertaining to the adjacent Lot 1, Block 11 property, which Fort Linwood owned and which had been subdivided into four lots.

Within the two weeks that followed the September 18 email, Fort Linwood sold to the Homeowners three of the four lots that would have been burdened by the easement in the agreement proffered to Parkwood. Each of the Homeowners' lots contained a single-family condominium, and the development's plat showed a 12-foot "access easement" behind the homes, as the following reflects.



The Developers planned to construct mirror-image condominiums—using both the lot and the plans they had acquired from Fort Linwood—that would share the twelve-foot access easement shown on the plat.

Some ten months after first emailing Parkwood, Fort Linwood sent a follow-up email to Parkwood on July 23, 2018 about the "access easement" agreement, stating

that because Fort Linwood now owned only one of the four lots, it could no longer approve and sign the agreement. It recommended contacting the homeowners' association (HOA) to see about arranging for "the other homeowners to agree and sign a new access easement agreement." Later that day, however, Fort Linwood told Parkwood that it had confirmed with the HOA that it (Fort Linwood) could "go ahead and execute [the] access easement agreement and record." In the agreement executed on July 26, 2018, Fort Linwood, reciting that it owned all four lots, purported "to create and grant a perpetual, non-exclusive easement over the **12 foot** access easement depicted on the Fort Linwood Plat" to provide pedestrian and vehicular access to both the Fort Linwood and the Parkwood lots in exchange for Parkwood's being responsible for 50% of the easement's maintenance.

When the Developers later tried to use the easement to build on their adjoining lot, the Homeowners sued the Developers, Fort Linwood, and PBP Properties, LLC, in December 2018.

## B. Procedural history

After the Homeowners sued, Fort Linwood and PBP moved for summary judgment, arguing that the Homeowners had bought their lots with notice of the access easement in the plat, the CCRs, and their title-commitment documents and that the access-easement agreement benefited them by splitting the maintenance costs that the Homeowners would otherwise entirely bear. Fort Linwood and PBP further argued that the CCRs gave Fort Linwood, as the declarant, the authority to execute

5

the access-easement agreement and that the plat and the CCRs "clearly show[ed]" that the access easement was public. The Developers joined in Fort Linwood's summary-judgment motion.

The Homeowners filed a response and cross-motion for summary judgment. They argued in their response that the access-easement agreement purported to burden their lots with a 12-foot easement in Parkwood's favor and that they discovered this after the City of Fort Worth issued notice that Parkwood intended to develop and build on Lot 2. They also stated that the easement shown on the plat could not simultaneously be both a "public" and a "private" easement, referencing the following to support their argument: the "owner dedication" language and note #18 on "private maintenance" in the plat (described below); the CCRs' expressly granting an easement to emergency services that would have been unnecessary if the easement was "public"; and the existence of the 2018 access-easement agreement, which would have been unnecessary if the easement were already "public," and which—if public—would not require sharing maintenance costs.

The Homeowners also pointed out that their title commitments did not identify a 12-foot "public" access easement because the plat merely states "access easement" and that the CCRs refer to a "Public Right of Way Easement" only in the definitions but do not contain a specific grant of the easement or otherwise mention it

elsewhere. They contended that ejusdem generis[1] should apply to Section 7.01 of the CCRs, which listed examples of Fort Linwood's authority as declarant to grant easements, and that it could not reasonably be argued that granting access to a developer or construction company was in any way similar to the thirteen specific purposes set out in that section. And, as a summary-judgment ground, they argued that Fort Linwood had no authority to grant the easement because, contrary to its ownership representation in the access-easement agreement, it no longer owned Lots 1-R-2, 1-R-3, and 1-R-4, and because Fort Linwood had conveyed the authority to grant easements when it conveyed the Homeowners' lots to them. They requested a declaration that the agreement was void.

During the pendency of the summary-judgment motions, the Developers brought counterclaims against the Homeowners for an implied or equitable easement and for damages caused by the Homeowners' repudiation of the access easement,

---

[1]The rule of ejusdem generis provides that

> where specific and particular enumerations of persons or things in a statute are followed by general words, the general words are not to be construed in their widest meaning or extent, but are to be treated as limited and applying only to persons or things of the same kind or class as those expressly mentioned.

*Stanford v. Butler*, 181 S.W.2d 269, 272 (Tex. 1944). Ejusdem generis may apply to an ambiguous contract, but it does not apply when the parties' intent is apparent. *Nicol v. Gonzales*, 127 S.W.3d 390, 395 (Tex. App.—Dallas 2004, no pet.).

7

tortious interference with contract, and slander of title. The Homeowners answered with a general denial and raised the affirmative defenses of justification and privilege.

In a November 12, 2019 interlocutory order, the trial court denied the summary-judgment motion of Fort Linwood, PBP, and the Developers and granted the Homeowners' motion, declaring that the access-easement agreement between Fort Linwood and Parkwood was void. The case then proceeded to trial on November 15, 2019, but recessed when the trial court ordered the parties to mediation. Several months later, PBP was nonsuited.

On September 9, 2020, the trial court signed an agreed order of partial dismissal with prejudice and partial vacation of the November 12, 2019 summary judgment. The order vacated any relief granted to the Homeowners against Fort Linwood and PBP and dismissed all the claims against Fort Linwood and PBP with prejudice. The order stated that it did not dispose of any previous orders rendered against the Developers or any of the claims against them.

In their live pleading at the time the trial court dismissed Fort Linwood and PBP, the Homeowners sought a declaration that the easement did not grant access across their lots by anyone other than the property owners and that the Developers and anyone acting on their behalf should be permanently enjoined from using the easement to develop the adjoining land. They argued alternatively that declaring the easement public under any theory would constitute an unconstitutional taking, and

8

they sought attorney's fees. The Homeowners filed another summary-judgment motion.

In their new motion, the Homeowners argued that the trial court had already rendered summary judgment that there was no express grant of an easement in the Developers' favor regarding the 12-foot driveway. The Homeowners further argued that no basis existed for an easement by necessity, by implied dedication, by estoppel, or by prescription; that they had no actual or constructive knowledge of a public easement; and that Fort Linwood and the HOA lacked the power to grant an easement to the Developers. They also moved for summary judgment on the Developers' counterclaims and requested an award of attorney's fees. The Homeowners incorporated by reference the arguments and authority set out in their earlier motion and relied on, among other things, "[a]ll trial [e]xhibits offered and admitted into evidence at the first day of the November 15, 2019 trial of this cause."

After receiving two continuances, the Developers filed a response to the motion. In their response, they argued that the easement was public via express dedication in the plat; that the access-easement agreement was not void and that it merely set out "controls" for such matters as obstructions, parking, and maintenance; that the Homeowners were on notice of the public easement based on the plat, their title policies, and the CCRs; and that alternatively, the Developers had an easement by estoppel. They challenged the Homeowners' request for attorney's fees but did not

challenge the summary-judgment motion on their repudiation, tortious-interference, and slander-of-title counterclaims.

On November 10, 2021, the trial court granted the Homeowners' motion. In its final judgment, the trial court declared that the Homeowners owned the 12-foot drive crossing their properties, that it was a private way of access to their residences, and that there was no express or implied public-way easement across their properties. It also permanently enjoined the Developers from entering upon the drive without the Homeowners' prior permission and ordered that the Developers take nothing on their counterclaims. It incorporated into the final judgment the non-vacated portion of its previous summary-judgment order, which had granted the Homeowners' earlier summary-judgment motion and denied Fort Linwood's motion in which the Developers had joined. It also awarded $64,900 in attorney's fees to the Homeowners and provided for their attorney's fees on appeal.[2] *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

### III. Discussion

The Developers argue that the trial court erred by granting summary judgment for the Homeowners, contending that the approved plat's express dedication created a

---

[2]In their appellees' brief, the Homeowners complain that the amount of appellate attorney's fees awarded to them is insufficient and ask us to modify and increase the amount. But they did not file their own notice of appeal, and we may not award to them greater relief than that awarded by the trial court. *See* Tex. R. App. P. 25.1(c).

public easement, that the 2018 access-easement agreement was valid, and—alternatively—that they possess an easement by estoppel.[3]

## A. Summary of the relevant documents

We begin by summarizing each relevant document.[4]

### 1. The Plat

Fort Linwood recorded its plat in the Tarrant County real property records in August 2016, outlining developments for the Weisenberger Addition.[5] It placed and labeled a "12' ACCESS EASEMENT" on Lots 1-R-1 through 1-R-4 between the

---

[3]In a summary-judgment case, the issue on appeal is whether the movant met the summary-judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

[4]We construe condominium declarations under the rules of contract interpretation, and contracts—like statutes and ordinances—should be construed based on their plain language and by considering the entire writing in an effort to give effect to all of the provisions so that none will be rendered meaningless. *Est. of Douglas v. Castillian Condos., Inc.*, No. 02-21-00321-CV, 2022 WL 4373603, at *5 (Tex. App.—Fort Worth Sept. 22, 2022, no pet.) (mem. op.); *City of Grapevine v. Muns*, 651 S.W.3d 317, 335 (Tex. App.—Fort Worth 2021, pet. filed) (op. on reh'g); *see Bd. of Adjustment of City of San Antonio v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002). The primary goal of construction is to effectuate—as expressed in the document—the intent of the contracting parties, the legislature, or the city council. *See Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 642 S.W.3d 551, 557 (Tex. 2022) (statute); *Monroe Guar. Ins. Co. v. BITCO Gen. Ins. Corp.*, 640 S.W.3d 195, 198–99 (Tex. 2022) (contract); *Wende*, 92 S.W.3d at 430 (ordinance).

[5]Fort Linwood filed a corrected plat on July 11, 2017, but the corrections are irrelevant to this case.

homes to be built on the lots and the lots' rear boundaries, which adjoined the undeveloped Weisenberger Addition 388-A, "Lot 2, Block 11" that Parkwood bought several months later, in December 2016.

The plat contains eighteen notes.[6] One of them provides that the City of Fort Worth will not be responsible for maintenance on the land, stating,

> 8. Private Common Areas and Facilities
> The City of Fort Worth shall not be held responsible for the construction, maintenance or operation of any lots containing private common areas or facilities identified as such on this plat. Said areas shall include, but not be limited to: private streets, emergency access easements, and gated security entrances, recreation areas, landscaped areas and open spaces, water and wastewater distribution systems and treatment facilities, and recreation/clubhouse/exercise/buildings and facilities.
> The land owners and subsequent owners of the lots and parcels in this subdivision, acting jointly and severally as a land owners association, shall be responsible for such construction, reconstruction, maintenance and operation of the subdivision's private common areas and facilities, and shall agree to indemnify and hold harmless the City of Fort Worth, Texas from all claims, damages and losses arising out of, or resulting from the performance of the obligations of said owners association, as set for[th] herein.

Another note identifies how residential driveway access will be situated, stating,

> 14. Residential Driveway Access Limitation
> Driveway access from an adjacent urban local residential, limited local residential, cul-de-sac, loop, or collector street to a residential lot less than fifty (50) feet in width a[t] the building line shall be by one of the following means

---

[6]The plat notes are typed in all caps, but in quoting some of the notes below, we have converted the case for readability.

a. Rear entry access shall be provided from an abutting side or rear alley or

b. A common shared driveway, centered over the common lot lines between the adjacent dwelling units, shall be provided within an appropriate access easement.

The "rear building line" shown on the plat for Lots 1-R-1, 1-R-2, 1-R-3, and 1-R-4 is 20 feet.

And another note, again addressing private rather than public maintenance, states,

18. Private Maintenance
The City of Fort Worth shall not be responsible for maintenance of private streets, drives, emergency access easements, public pedestrian access easements, recreation areas, open spaces and drainage facilities and said owners agree to indemnify and save harmless the City of Fort Worth, Texas, from claims, damages and losses arising out of or from performance of the obligations of said owners set forth in this paragraph.

The plat also contains the following boilerplate language under Fort Linwood's dedication: "Know all men by these presents that Fort Linwood, LLC is the owner of the following described property . . . and do hereby dedicate to the public's use the streets and easements as shown hereon."

**2. The CCRs**

The CCRs, recorded in the Tarrant County real-property records on August 16, 2017, describe the four lots and recite Fort Linwood's intent (as the declarant) "to impose mutually beneficial restrictions under a general plan of improvement for the

benefit of all owners of property within the Development." In Article I, "Definitions," the CCRs identified "common property" as

> all real property together with any and all improvements now or hereafter located thereon or in certain instances over which the [HOA] has been granted easements, for the common use and enjoyment of the Owners or the benefit of the [HOA] . . . together with any other property or easement rights that the [HOA] may from time to time acquire by purchase, assignment or otherwise, subject however to the easements, limitations, restrictions, dedications and/or reservations applicable thereto by virtue of this Declaration, the Plat, and/or prior grants or dedications by Declarant or Declarant's predecessors in title.

Article I also identifies a "Public Right of Way Easement" as "the 12' access easement located on the rear and/or side of each Lot which has been designated to the public's use as more particularly depicted and described on the Plat."

In Article II, "Common Property," the CCRs state that the declarant could convey common property to the HOA "for access, ingress and egress of both vehicular traffic and pedestrians . . . [and could, at its] sole discretion, modify, alter, increase, reduce, and otherwise change the Common Property . . . at any time prior to" conveying it to the association. Under this section, the HOA has the right to "[g]rant easements or rights of way over Common Property to any entity including but not limited to any municipality or other governmental body, agency or authority, any quasi-public agency or any utility company or cable television system." Article I states, "The sale by Declarant of any portion of the Property shall not include the conveyance of any of the rights of Declarant under this Declaration unless those rights are specifically conveyed in the conveyance document."

14

Under Article VI, "General Covenants and Restrictions," which applies to all lots and all structures built on the lots, regarding prior easements or restrictions, the CCRs state,

> Along with the easements and restrictions contained in these Restrictions, the Property is subject to all implied or expressed restrictions, easements, licenses, leases, and encumbrances of record, including the Public Right of Way Easement. Each Owner shall be bound by any prior-recorded restriction, easement, license, lease, and/or encumbrance, including without limitation, the Public Right of Way Easement, and further agrees to maintain any easement, including without limitation, the Public Right of Way Easement, that affects an Owner's Lot.

Under Article VII, "Easements, Zoning and Other Restrictions," the declarant expressly reserves to itself, its successors, and its assigns

> the right to create perpetual easements in, on, over and under any part of the Property for any purpose that Declarant deems necessary (hereafter the "Easement Area"), including, by way of example, and not limitation, the following:

> [i]     The erection, installation, construction and maintenance of cable wires, lines, pipes, conduits and poles and the necessary or proper attachments, equipment and/or infrastructure in connection with the transmission of electricity, telephone, cable television, communication systems, cables and other utilities and similar facilities;

> [ii]     The erection, installation, construction and maintenance of infrastructure for the collection of domestic waste;

> [iii]     The erection, installation, construction and maintenance of storm-water drains, land drains, public and private sewers, irrigation systems for Common Property, pipelines for supplying gas, water and heat, and for any other public or quasi-public facility, service or function;

> [iv]     An easement of support in every portion of the Lot [that] contributes to the support of a Residence.

[v]    Slope control purposes, including the right to grade and plant slopes and prevent the doing of any activity [that] might interfere with slopes or [that] might create erosion or sliding problems of which might change, obstruct or retard drainage flow; and

[vi]    The planting or re-planting of hedges, shrubbery, bushes, trees, flowers and plants of any nature within easements and Common Property.

[vii]    To inspect the Property for compliance with maintenance and architectural standards and enforce said standards;

[viii]    To enforce the Restrictions;

[ix]    To respond to emergencies;

[x]    To perform maintenance that is permitted or required of the Owner by any governmental entity with applicable jurisdiction, if the Owner fails or refuses to perform such maintenance;

[xi]    To grant easements to utility providers as may be necessary to install, maintain, and inspect any utilities serving the Property; and

[xii]    To perform any and all functions or duties of the Association, Board or Declarant as required by any governmental entity with applicable jurisdiction.

It also grants a non-exclusive easement of ingress and egress to the declarant, the board, the HOA, and all police, fire protection, ambulance, emergency medical services, and other emergency or municipal residential utility and service providers to enter upon the common property in performance of their duties. To the declarant, each lot, and each owner, it grants an easement over the adjoining lots "for the purpose of accommodating any encroachment due to engineering errors, errors in original construction, settlement[,] or shifting of any Structure, or any other similar cause," and it grants a two-foot-wide easement for any company furnishing audio and

video communication services and utilities made available through an underground coaxial cable system. It also prohibits any owner from using any easement retained by the declarant or conveyed by the declarant to the HOA "in a manner [that] is inconsistent or [that] interferes with the intended use for such easement."

### 3. The Homeowners' warranty deeds

The Howards' deed, effective September 28, 2017, provided that Fort Linwood granted, bargained, sold, and conveyed to them Lot 1-R-3 and "all of Grantor's right, title and interest in and to the fixtures and improvements located on the Land . . . together with all rights, privileges and easements appurtenant to the Land . . . and any and all easements, rights-of-way and other appurtenances used in connection with the beneficial use and enjoyment of the Land, in each case to the extent assignable." It was "made and accepted subject to any and all validly existing encumbrances, conditions and restrictions . . . as now reflected by the [Tarrant County real-property] records." Chang's deed, effective October 2, 2017, for Lot 1-R-4, contained the same language.

Kunkle and Stokes's deed, effective September 22, 2017, for Lot 1-R-2, contained the same initial language as the two above deeds but did not contain the reference to existing and recorded encumbrances, conditions, or restrictions.

### 4. The Homeowners' commitments for title insurance

All three title commitments identified the declaration as containing restrictive covenants. The Howards' commitment also identified the plat as a restrictive covenant.

The title commitments all identified the utility and access easements in the plat and a grant of "easement(s) and rights incidental thereto" to Oncor and to the City of Fort Worth. The Howards' and Kunkle and Stokes's commitments also identified an unrelated-to-this-case easement access agreement. The Howards' and Chang's title commitments are dated September 13, 2017. Kunkle and Stokes's title commitment is dated August 6, 2017.

### 5. The access-easement agreement

On July 26, 2018, Fort Linwood entered into and then recorded the access-easement agreement with Parkwood. The agreement identifies Fort Linwood as the owner of all four lots in Lot 1, Block 11 of the Weisenberger Addition and Parkwood as the owner of Lot 2, Block 11 of the Weisenberger Addition. It states,

> [F]or the benefit of Parkwood, Fort Linwood, and all future owners of the Fort Linwood Lots and the Parkwood Lot (collectively, the "Lots"), Fort Linwood desires to create and grant a perpetual, non-exclusive easement over the 12 foot access easement depicted on the Fort Linwood Plat (the "Easement Area") for purposes of providing access to the Lots from Currie Street and Weisenberger Street on the terms and conditions set forth in this Agreement.

Fort Linwood granted to Parkwood "and its Permitees" and reserved to itself and its permittees "a perpetual, non-exclusive easement for pedestrian and vehicular access

18

over and across the roads and driveways that may from time to time exist within the Easement Area on the Fort Linwood Lots (the 'Access Easement')." It defined "permittees" to "include a Party's agents, employees, tenants, contractors, representatives, occupants, guests, invitees, licensees, successors and assigns," and stated that the easement area's maintenance and upkeep would be allocated 50/50 between the Fort Linwood Lot owners and the Parkwood Lot owners.

**6. Fort Worth subdivision ordinance**

In their briefs' appendices, both the Developers and the Homeowners provided a copy of Fort Worth Subdivision Ordinance Section 31.106, governing street-design standards. *See* Fort Worth, Tex., Code of Ordinances ch. 31, §§ 31.1–.171 (2022), *at* https://codelibrary.amlegal.com/codes/ftworth/latest/ftworth_tx/0-0-0-29499 (hereinafter, Sub. Ord.). We take judicial notice of the following pertinent sections. *See* Tex. R. Evid. 201.

Section 31.106 addresses the different types of streets based on their land-use contexts. Sub. Ord. § 31.106(a). It provides for a "residential driveway access limitation," which parallels the language in plat note #14 in that it requires that

> [d]riveway access from an adjacent urban local residential, limited local residential, cul-de-sac, loop, or collector[ ]street to a residential lot less than 50 feet in width at the building line shall be by rear access by one of the following means:
>
> a. From an abutting side or rear alley or side or rear driveway with an appropriate access easement; or

19

b. From a common shared driveway, centered over the common lot lines between the adjacent dwelling units continuing through to the rear of the dwelling units, shall be provided within an appropriate access easement.

*Id.* § 31.106(c)(13).

Section 31.106(i), "Access easement design standards (public access easements, reciprocal access easements, private drives or ways)," defines an access easement as "an officially approved and privately maintained 'drive' or 'way,' with the roadway constructed to city street standards that is open to unrestricted and irrevocable public access and serves two or more lots, each having a minimum of 100 feet of frontage each, as their primary means of access." *Id.* § 31.106(i)(1)a. An access easement, under the City's ordinance, is "designed to provide access from adjoining lots, such as within a 'conventional' or 'strip' shopping center, to an adjacent arterial street, usually in conjunction with a median break. They may also provide an alternate access to a collector or arterial street where unusual topography may otherwise impede a safe entry connection to the lots served." *Id.* § 31.106(i)(1)b. The City requires that "[t]he unobstructed easement width shall not be less than 24 feet," and that the easement paving width "shall not be less than 20 feet, and centered within the unobstructed access easement," with turnouts with not less than a 25-foot interior radius "measured at the vertex of the easement lines and an outside radius of 50 feet." *Id.* § 31.106(i)(2)– (4).

In contrast to its access-easement definition, the ordinance defines "private streets and alleys" as "private vehicular access ways shared by and serving three or

more lots, which are not otherwise dedicated to the public nor publicly maintained." *Id.* § 31.106(j)(1). On a plat, a private street or alley must be "accompanied by a standard plat note stating that the maintenance and upkeep shall be by a property owners association or other such legal entity empowered by deed restrictions to own and maintain such streets or alleys"—like plat note #8—and while the City "shall have no ownership or maintenance responsibilities associated with private streets or alleys," it will review the property-owners-association documents "prior to recording to ensure that adequate provisions of private perpetual ownership, maintenance and upkeep are provided for in the association documents and to ensure that there is no liability to the city." *Id.* § 31.106(j)(2). "No private street or alley shall be transferred to the city by a property owners association nor shall the city accept a transfer, unless the city has first determined that such streets and/or alleys meet or exceed the city's requirements for right-of-way, roadway paving and drainage standards in effect at time of transfer or dedication." *Id.* § 31.106(j)(4).

Section 31.171 defines the various terms in the Subdivision Ordinance, including "alley" (a minor right-of-way, not intended to provide the primary means of access to abutting lots, that is primarily for vehicular service access to the back or sides of lots or properties otherwise abutting on a street); "common area" (an area or facility that is owned jointly by the owners within the subdivision or members of the property-owners association, including—but not limited to—private parks, community buildings, and screening walls); "dedication" (a gift or donation of

21

property or interest in property by the owner to the public); "access easement" (an easement created to provide vehicular or pedestrian access to a property); "emergency access easement" (an easement on private property created to provide access for emergency vehicles to a property); "private streets" (private vehicular access ways shared by and serving three or more lots, which are not otherwise dedicated to the public nor publicly maintained); and "private street" (a vehicular access way under private ownership and maintenance that has not been dedicated to the city or accepted by the city). *Id.* § 31.171.

## B. The Developers' issues

### 1. Express dedication

In their first issue, the Developers contend that the approved plat's express dedication created a public easement that they should be allowed to use.

A dedication for public use requires the following: (1) the person who makes the dedication must have the ability to do so, i.e., have fee simple title; (2) there must be a public purpose served by the dedication; (3) the person must make either an express or implied offer; and (4) there must be an acceptance of that offer. *Street v. Chance*, No. 02-18-00409-CV, 2019 WL 2293185, at *3 (Tex. App.—Fort Worth May 30, 2019, no pet.) (mem. op.) (citing *Spinuzzi v. Town of Corinth*, 665 S.W.2d 530, 532 (Tex. App.—Fort Worth 1983, no writ)).

An express dedication requires the showing of a declaration or some express manifestation of the purpose to devote the land to public use. *Id.* (citing *Gutierrez v.*

22

*Cnty. of Zapata*, 951 S.W.2d 831, 837, 840 (Tex. App.—San Antonio 1997, no writ)). Accordingly, we first look to the plat and related CCRs. *See Anderson v. Tall Timbers Corp.*, 378 S.W.2d 16, 19 (Tex. 1964);[7] *see also* Tex. Loc. Gov't Code Ann. § 212.004(b) (stating that to be recorded, a plat must, among other things, "state the dimensions . . . of each street . . . or other part of the tract intended to be dedicated to public use or for the use of purchasers or owners of lots fronting on or adjacent to the street . . . or other part").

Fort Linwood owned the property at the time of the dedication, Fort Linwood's plat dedicated to public use the easements shown on it, and the CCRs identified as a "public right of way easement" a 12-foot access easement "as more particularly depicted and described on the Plat." Accordingly, the record reflects at least two elements of an express public dedication. *See Street*, 2019 WL 2293185, at *3.

But a plat's approval is not considered an *acceptance* of a proposed dedication and does not impose on a municipality any duty to maintain or improve any dedicated parts until the proper municipal authorities actually appropriate—by entry, use, or

---

[7]In *Anderson*, the plat dedicated "the use of the *streets* shown hereon" to public use. 378 S.W.2d at 19. (emphasis added). The plat's dedication did not mention the 40-foot easement shown on the plat, and the court concluded—after reviewing the plat and the CCRs—that "the easement areas shown on the plat were not dedicated to the public for any use." *Id.* at 21 ("[T]here are no circumstances under which it can be said that the reservation of the [40-]foot easement area in controversy carried a dedication as a public street.").

improvement—the dedicated parts. Tex. Loc. Gov't Code Ann. § 212.011(a).[8] To complete a public easement's creation by express dedication, a governmental entity must accept the dedication by or on behalf of the public. *Lambright v. Trahan*, 322 S.W.3d 424, 432 (Tex. App.—Texarkana 2010, pet. denied). Formal acceptance is relatively easy to determine because it is done by governmental-entity action and recorded by such things as meeting minutes. *Id.* Informal acceptance can be implied if the public uses the easement by general and customary use. *Id.* (referencing *Viscardi v. Pajestka*, 576 S.W.2d 16, 19 (Tex. 1978), which noted that whether public right of way has been acquired by dedication is generally a fact question). The record here reflects no evidence of either a formal or an informal acceptance by the public.[9] Accordingly, the trial court did not err by denying summary judgment to the Developers based on their public-easement theory, and we overrule this portion of their first issue.

---

[8]On the other hand, a plat's disapproval *is* considered a municipality's refusal of a plat's offered dedication. Tex. Loc. Gov't Code Ann. § 212.011(b).

[9]Further, the plat's access easement does not meet the city's requirements set out in the subdivision ordinance for an access easement: the plat's easement measures only 12 feet wide while the ordinance requires a width of not less than 24 feet, with a paving width of not less than 20 feet. *See* Sub. Ord. § 31.106(i). Instead, the plat's easement most closely resembles the ordinance's definition of "private streets"— "private vehicular access ways shared by and serving three or more lots, which are not otherwise dedicated to the public nor publicly maintained"—and the "residential driveway access limitation." *See id.* §§ 31.106(c)(13), (j)(1), .171.

24

## 2. Access-easement agreement

The Developers next claim, in part of their first issue and in their second issue, that the 2018 access-easement agreement validly created an easement for their use and that the trial court improperly declared it void. The agreement's validity, however, relies on Fort Linwood's authority to enter into it.

The CCRs authorized the HOA—not Fort Linwood—to grant easements over common property. And although Fort Linwood, as the declarant, reserved to itself the right to create easements "for any purpose [it] deems necessary," the types of easements it cited as examples of what it could create focused on infrastructure matters or government requirements, such as the installation of pipes, poles, and wiring for various utilities; the collection of domestic waste; irrigation; erosion prevention; landscaping; emergency response; code-enforcement-related maintenance; and "functions or duties of the [HOA], Board or Declarant as required by any governmental entity with applicable jurisdiction." In light of the CCRs' purpose, which is "to impose mutually beneficial restrictions under a general plan of improvement *for the benefit of all owners of property within the development*," the Developers have not shown how granting an easement to the developer-next-door was "necessary" for the Homeowners' benefit in the same way that an easement for, say, trash collection or emergency response would be. [Emphasis added.] Moreover, the record does not contain evidence of the costs involved in maintaining the easement,

what fifty percent of that amount would be, and how the easement might otherwise benefit the Homeowners.

To further support their argument that the trial court could not void the easement agreement, the Developers point out that a contract is void only if it violates a specific statute or is against public policy. *See Swain v. Wiley Coll.*, 74 S.W.3d 143, 146 (Tex. App.—Texarkana 2002, no pet.).

As reflected on the agreement's face, Fort Linwood purported to represent that it could "create and grant" an easement "over the 12 foot access easement depicted on the Fort Linwood Plat" as the owner of the four lots, when in fact, it then owned only one of them. An easement is an interest in real estate. *Copano Energy, LLC v. Bujnoch*, 593 S.W.3d 721, 727 (Tex. 2020). "Texas law prohibits false representations in transactions involving real estate." *Fibela v. Wood*, No. 08-20-00019-CV, 2022 WL 4538878, at *5 (Tex. App.—El Paso Sept. 28, 2022, no pet.) (citing Tex. Bus. & Com. Code Ann. § 27.01). On this record, we cannot say that the trial court erred as a matter of law by granting the Homeowners' motion on this issue as to *their* lots, and we overrule this portion of the Developers' first issue and their second issue.

### 3. Easement by estoppel

The Developers alternatively argue, in their third issue, that they possess an easement by estoppel. Under the easement-by-estoppel doctrine, the owner of the alleged servient estate may be estopped from denying an easement's existence if that owner made representations that the owner of the alleged dominant estate (the

promisee) acted on. *Schwendeman v. BT SFRL I, LLC*, No. 02-19-00007-CV, 2020 WL 479592, at *8 (Tex. App.—Fort Worth Jan. 30, 2020, pet. denied) (mem. op.).

The elements required to create an easement by estoppel are (1) a representation of the easement communicated, either by words or action, by the owner to the promisee; (2) the communication was believed; and (3) the promisee relied upon the communication. *Id.* These elements apply at the time the communication creating the alleged easement is made. *Id.* Once created, the easement binds the servient estate's owner and his successors in interest if they had notice—actual or constructive—of the easement claimed. *Id.* It is also binding if the dominant estate's owner and his successors in interest continue to rely upon the easement's existence. *Id.* "Servitudes or easements must be created by the owner." *F.J. Harrison & Co. v. Boring & Kennard*, 44 Tex. 255, 267 (1875); *see Storms v. Tuck*, 579 S.W.2d 447, 451 (Tex. 1979) ("As generally stated, the doctrine holds that the owner of land may be estopped to deny the [e]xistence of an easement by making representations that have been acted upon by a purchaser to his detriment.").[10]

---

[10]In *Storms*, the court noted that in the traditional easement-by-estoppel case, there is generally no written grant of an easement and instead a parol grant or a representation that an easement already exists, and the issue revolves around whether the easement exists. 579 S.W.2d at 452. Such cases generally involve the servient estate owner's oral promise to convey an easement, his oral grant of an easement, his statement that an easement exists when in fact it does not, or his remaining silent in the face of a duty to speak, in reliance on which the other party expends money in making improvements. *Id.* at 453. Under this list of circumstances, the doctrine

The record reflects that by the time Fort Linwood recommunicated to the Developers the possibility of an access easement in its July 23, 2018 email, Fort Linwood no longer owned three of the four lots that would have otherwise been servient and that the Homeowners never made any representations to the Developers. Accordingly, the trial court did not err by concluding that no easement had been created by estoppel with regard to the Homeowners.[11]

## IV. Conclusion

Having overruled the Developers' issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: February 2, 2023

---

prevents the servient estate's owner from asserting the statute of frauds as a defense in denial of the easement's existence. *Id.* at 454. Here, there is no evidence to show that the Developers spent any money on improvements before or after the Homeowners filed suit.

[11]Based on our conclusions that neither a public easement (by plat) nor a private easement (by contract or estoppel) was created, we do not reach the Developers' notice-based arguments. *See* Tex. R. App. P. 47.1.

28